**UNION PACIFIC RAILROAD COMPANY, Appellee,**

v.

**UNITED TRANSPORTATION UNION, also known as C & T, also known as UTU; Kent H. Madison, Appellants.**

No. 92–2547.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 22, 1993.

Decided Aug. 19, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 27, 1993.

Kevin C. Brodar, Cleveland, OH, argued (Robert E. O'Connor, Omaha, NE, on the brief), for appellants.

Kathleen J. Ford, Omaha, NE, argued, for appellee.

Before McMILLIAN, WOLLMAN, and BEAM, Circuit Judges.

WOLLMAN, Circuit Judge.

United Transportation Union (the "union") and Kent H. Madison appeal from the district court's order vacating an arbitration award in Madison's favor on the ground that the award violates public policy. We affirm in part, reverse in part, and remand for further proceedings.

## I.

The facts in this case are essentially undisputed. On January 9, 1989, W.R. Lake, a manager for the Union Pacific Railroad Company ("Union Pacific"), overheard a radio communication concerning a run-through switch at the Cheyenne, Wyoming railroad yard. Lake went to the Cheyenne yard to investigate and conducted separate interviews with each member of the crew involved in the incident. Madison, a brakeman, admitted that he had improperly lined the switch against the movement of the train, causing two and a half cars to run through and damage the switch.

Lake sent Madison to the Laramie County Memorial Hospital for a reasonable-cause toxicological test pursuant to Federal Railroad Administration regulations. *See* 49 C.F.R. § 219.301. Madison submitted to two urine tests, which were forwarded to a medical laboratory for review. Lake drove Madison back to the depot and informed Madison that he was being removed from service pending receipt of the drug test results.

On January 13, 1989, Union Pacific notified Madison that it would conduct a hearing to investigate Madison's possible violations of Union Pacific's Rule G, an industry-wide rule that prohibits the use of drugs or alcohol on

the job, while subject to duty, or on company property.[1] Union Pacific held an on-property hearing on January 17 to determine whether Madison had violated either Rule G or company rules concerning the lining of the switch. Near the conclusion of the hearing, the hearing officer remarked on the record that Madison "reek[ed] of alcohol." The hearing officer then asked two other Union Pacific employees to determine whether they also smelled alcohol on Madison's person. Although the two employees stated that they smelled something, they could not tell what it was. After the union representative voiced his objection to the hearing officer's statement and actions, the hearing officer concluded the hearing. On January 24, 1989, Union Pacific notified Madison that the charges against him had been sustained and that he was being discharged for violating Rule G.

The union appealed on Madison's behalf, and the dispute was ultimately submitted to arbitration before a Public Law Board (the "Board")[2], consisting of one union representative, one Union Pacific representative, and a neutral chairman. The chairman ruled on the Board's behalf that Union Pacific's hearing officer had violated Madison's due process rights as established in the collective bargaining agreement because the hearing officer's comments had strayed outside the issues submitted for determination and had denied Madison a fair hearing. Consequently, the Board never considered whether Madison had, in fact, violated Rule G.[3] The Board ordered Union Pacific to reinstate Madison with full rights and backpay for all lost time except for ninety calendar days, which the Board assessed as Madison's penalty for admittedly mislining the switch. The Board conditioned Madison's reinstatement on passing the normal back-to-work examinations. Union Pacific's representative dissented, asserting that the Board's award "[put] back to work a proven user of alcohol and drugs," in violation of public policy.

Rather than reinstating Madison, Union Pacific filed a complaint in federal district court, seeking to have the Board's award overturned. The union and Madison counterclaimed for enforcement of the award. Both sides filed summary judgment motions. The district court granted Union Pacific's motion and vacated the award, finding that reinstating Madison would violate the public policy against the use of drugs and alcohol by railroad employees. *See Union Pac. R.R. v. United Transp. Union,* 794 F.Supp. 891, 895 (D.Neb.1992). The district court remanded the action to the Board, directing it to order a new on-property hearing before a Union Pacific hearing officer. This appeal followed.

## II.

After oral argument in this case, we directed the parties to file supplemental briefs on the question whether we possess jurisdiction to hear this appeal. Having considered the

---

1. Rule G reads as follows:
   The use of alcoholic beverages, intoxicants, drugs, narcotics, Marijuana or controlled substances by employees subject to duty, when on duty or on Company property is prohibited.

   Employees must not report for duty, or be on Company property under the influence of or use while on duty or have in their possession while on Company property, any drug, alcoholic beverage, intoxicant, narcotic, marijuana, medication, or other substance, including those prescribed by a doctor, that will in any way adversely affect their alertness, coordination, reaction, response or safety.

   The Federal Railroad Administration has codified the provisions of Rule G by adopting substantially identical regulations. *See* 49 C.F.R. §§ 219.101–102.

2. Public law boards created under the Railway Labor Act are also often referred to as adjustment boards or special boards of adjustment. Public law boards are created by agreement between employers and unions to take the place of compulsory arbitration before the National Railroad Adjustment Board. 45 U.S.C. § 153 Second.

3. Union Pacific asserts that the results of the January 9 toxicological test, which were presented to the Board, showed that Madison had alcohol, cocaine, and marijuana in his system at the time of the incident. The union counters that because the Board never passed on the reliability of the test, Madison's use of drugs has not been established. As discussed below, we may not make or rely on factual findings that the Board has not made. *See United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 44–45, 108 S.Ct. 364, 374–75, 98 L.Ed.2d 286 (1987). Accordingly, we have not decided this case on the assumption that the drug test results were positive.

parties' contentions and the relevant case law, we conclude that under the facts of this case the district court's decision is a final order, appealable under 28 U.S.C. § 1291.

■ "A 'final decision' [under section 1291] generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945); *see also Thomas v. Basham*, 931 F.2d 521, 523 (8th Cir.1991); *Transportation–Communication Div. v. St. Louis–San Fran. Ry.*, 419 F.2d 933, 935 (8th Cir.1969), *cert. denied*, 400 U.S. 818, 91 S.Ct. 34, 27 L.Ed.2d 45 (1970). The district court's ruling in this case, which it styled as an "order and judgment," granted Union Pacific's motion for summary judgment and vacated the Board's award, rendering the award a nullity. The effect of the district court's order was to resolve completely the question whether Union Pacific's procedural violations in the first on-property hearing entitled Madison to reinstatement. Moreover, if we do not review the district court's order at this point, it will become essentially unreviewable because an enforcement action after a second Board award would be limited to the propriety of that award.

Although the court did remand the case, it remanded with directions for a new on-property hearing, impliedly on the merits of the Rule G violation. This remand was not for the purpose of seeking clarification from the Board or directing the Board to receive additional evidence. *Cf. Transportation–Communication Div.*, 419 F.2d at 935 (district court's remand was not appealable where remand order directing public law board to consider additional evidence did not rule on either parties' summary judgment motions); *United Steelworkers v. Aurora Equip. Co.*, 830 F.2d 753, 754–55 (7th Cir.1987) (court of appeals lacked jurisdiction to review remand order directing arbitrator to consider new report and to decide two additional factual issues). Rather, the remand for a new on-property hearing on the merits of the Rule G allegation was, in practical effect, an order compelling a second arbitration, which generally constitutes a final decision for purposes

of section 1291. *See Goodall–Sanford, Inc. v. United Textile Workers Local 1802*, 353 U.S. 550, 551–52, 77 S.Ct. 920, 920–21, 1 L.Ed.2d 1031 (1957) (order compelling arbitration under section 301 of Labor Relations Management Act is appealable as final order); *University Life Ins. Co. of America v. Unimarc Ltd.*, 699 F.2d 846, 848 (7th Cir.1983) (discussing generally when orders to arbitrate constitute final orders for purposes of section 1291).

### III.

■ Turning to the merits of the appeal, we must initially confront the question whether federal courts possess authority to vacate arbitration awards under the Railway Labor Act on public policy grounds. We conclude that federal courts may do so when those awards violate well-defined and dominant public policies.

The Railway Labor Act contains a comprehensive system of dispute resolution for employer/employee disputes involving the interpretation of collective bargaining agreements. Congress created this system, under which these "minor" disputes are resolved by mandatory arbitration, to promote stability in labor-management relations in the nation's vital railroad industry. *See Union Pacific R.R. v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 402–03, 58 L.Ed.2d 354 (1978) (per curiam). Accordingly, the Railway Labor Act contains only three statutory bases for review of a decision issued by a public law board: (1) failure of the adjustment board or public law board to comply with the requirements of the Railway Labor Act; (2) failure of the adjustment board or public law board to conform, or confine itself, to matters within the scope of its jurisdiction; and (3) fraud or corruption on the Board's part. 45 U.S.C. § 153 First (q); *see Sheehan*, 439 U.S. at 93, 99 S.Ct. at 402. We, as other courts, have noted that statutory review of arbitration awards under the Railway Labor Act is "among the narrowest known to the law." *International Ass'n of Machinists v. Northwest Airlines*, 858 F.2d 427, 429 (8th Cir. 1988); *Benoni v. Boston and Maine Corp.*, 828 F.2d 52, 54 n. 3 (1st Cir.1987); *Diamond*

v. *Terminal Ry. Alabama State Docks*, 421 F.2d 228, 233 (5th Cir.1970).

The union and Madison argue that Congress's choice in enacting such narrow grounds for review in the Railway Labor Act precludes federal courts from reviewing such awards on public policy grounds. Moreover, they assert that since the enactment of the Railway Labor Act's review scheme in 1934, the Supreme Court has not seen fit to create any additional nonstatutory bases for review.

The strongest support for the union and Madison's argument stems from the Supreme Court's opinion in *Union Pacific R.R. v. Sheehan.* In that case, Sheehan had filed a breach of contract suit in state court arising out of his discharge. While his state court case was pending, the United States Supreme Court decided *Andrews v. Louisville & Nashville R.R.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972), in which the Court held that a railroad employee alleging a violation of a collective bargaining agreement must submit the matter to arbitration under the Railway Labor Act. When Sheehan subsequently filed his arbitration claim before the National Railroad Adjustment Board, the Board dismissed his claim as untimely, rejecting Sheehan's claim that the time limits should have been equitably tolled while his state court suit was pending. The district court upheld the Board's order, but the Tenth Circuit reversed. The Tenth Circuit reasoned that the Supreme Court's holding in *Andrews*, which had forced employees into arbitration before an adjustment board, required that the courts give less deference to purely legal issues decided by an adjustment board. *Sheehan v. Union Pacific R.R.*, 576 F.2d 854, 856 (10th Cir.1978). Thus, the Tenth Circuit held that "the failure of the Board to consider tolling under these circumstances deprived Sheehan of an opportunity to be heard in violation of his right of due process." *Id.* at 857.

The Supreme Court reversed and reinstated the adjustment board's award, *Sheehan*, 439 U.S. at 94, 99 S.Ct. at 402–03, holding that the Tenth Circuit had exceeded its jurisdiction. The Court stated that its holding in *Andrews* had not provided courts with great-er latitude to correct an adjustment board's errors of law:

> Characterizing the issue presented as one of law, as the Court of Appeals seemed to do here, does not alter the availability or scope of judicial review: The dispositive question is whether the party's objections to the Adjustment Board's decision fall within any of the three limited categories of review provided for in the Railway Labor Act.

*Id.* at 93, 99 S.Ct. at 402. Thus, because Sheehan had failed to show that the adjustment board's order fell within any of the three statutory categories for review, the order should have been enforced by the courts. *Id.* at 94, 99 S.Ct. at 402–03.

Although the Supreme Court's decision in *Sheehan* demonstrates the Court's concern for the finality of adjustment board awards under the Railway Labor Act, we disagree with the union and Madison's argument that it precludes federal courts from vacating such an award on public policy grounds. The Court in *Sheehan* did not address any public policy arguments; it merely responded to the Tenth Circuit's assertion that federal courts may review purely legal issues raised in arbitration awards. Moreover, we have uncovered no other opinion by either the Supreme Court or another court of appeals that expressly rejects the idea that federal courts may use public policy as a basis for overturning a board award rendered under the Railway Labor Act.

To the contrary, federal courts have consistently held that they may not enforce contracts that violate public policy. As the Supreme Court has stated,

> The power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in the Constitution, treaties, federal statutes, and applicable legal precedents. Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power.

*Hurd v. Hodge,* 334 U.S. 24, 34–35, 68 S.Ct. 847, 853, 92 L.Ed. 1187 (1948) (footnotes omitted).

The Supreme Court and our court have applied the public policy doctrine in cases involving arbitration awards. *See, e.g., United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 42, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987) ("A court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy."); *W.R. Grace and Co. v. Local Union 759,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183–84, 76 L.Ed.2d 298 (1983); *Iowa Elec. Light & Power v. Local Union 204,* 834 F.2d 1424, 1427 (8th Cir.1987) (overturning arbitration award reinstating nuclear power plant employee that had defeated containment safety devices).

The union and Madison dismiss these cases as irrelevant because they were decided under the National Labor Relations Act. They contend that arbitration awards under the Railway Labor Act are unique because of the narrow statutory grounds for review enacted by Congress. We cannot agree.

The task of the labor arbitrator is to interpret the collective-bargaining agreement for the parties and to state the parties' bargain on specific issues where they have neglected to do so in the written agreement. Consequently, the arbitrator's award, "just as a contract, is the expression of the parties' will." *Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173,* 886 F.2d 1200, 1206 (9th Cir.1989) (en banc), *cert. denied,* 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990). That rationale underlies the courts' limited review of arbitration awards; courts may only enforce the parties'

agreement, they may not create an agreement for the parties. We discern no significance to the issue of public policy review, however, from the fact that the arbitrator is expressing the parties' will pursuant to a generic arbitration agreement, the National Labor Relations Act, or the Railway Labor Act; in each case the arbitrator performs the same task of expressing the parties' will. In all of those cases, the rationale underlying the public policy doctrine—that courts should not lend their authority to agreements that harm the public—applies with equal force. Accordingly, we hold that a court may refuse to enforce the parties' agreement where a public policy would be violated by enforcing the agreement, whether expressed in the form of a private contract or an arbitration award under either the National Labor Relations Act or the Railway Labor Act.[4]

Our conclusion that arbitration awards under the Railway Labor Act are subject to public policy review does not mean, however, that courts are free to overturn any award with which they disagree. *See Misco,* 484 U.S. at 43, 108 S.Ct. at 373 (Supreme Court's application of public policy review to arbitration awards "does not otherwise sanction a broad judicial power to set aside arbitration awards"); *United Steelworkers v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 598–99, 80 S.Ct. 1358, 1361–62, 4 L.Ed.2d 1424 (1960) (court of appeals may not overturn an arbitrator's interpretation of a contract merely because the court would have interpreted it differently).

The Supreme Court has provided detailed and explicit guidance regarding the scope of public policy review. In *W.R. Grace,* the Supreme Court held that courts invoking public policy to overturn arbitration awards must be careful to rely on public policies that are "well defined and dominant" and that can

4. We note that several other courts have accepted without much discussion the idea that arbitration awards rendered under the Railway Labor Act are subject to public policy review. *See Delta Air Lines v. Air Line Pilots Ass'n, Int'l,* 861 F.2d 665, 674 (11th Cir.1988) (overturning award that reinstated a pilot who had flown a plane while intoxicated), *cert. denied,* 493 U.S. 871, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989); *Northwest Airlines v. Air Line Pilots Ass'n, Int'l,* 808 F.2d 76, 83–84 (D.C.Cir.1987) (acknowledging public policy as basis for vacating a Railway Labor Act arbitration award, but finding no violation of public policy on the facts of that case), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988); *In re: Pan American Corp.,* 140 B.R. 336, 341 (S.D.N.Y.1992) (same); *Schmidt v. Republic Airlines,* 630 F.Supp. 1303, 1305 (D.Minn.1986) (same).

be "ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" 461 U.S. at 766, 103 S.Ct. at 2183 (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)).

Several terms later, the Court clarified the narrow scope of public policy review in *Misco.* In *Misco,* an employee that ran a dangerous machine in a papermill was caught by police in the company parking lot in a car with marijuana smoke filling the air and a lighted marijuana cigarette still smoldering in the ashtray. 484 U.S. at 33, 108 S.Ct. at 368. The company discharged the employee for violating a company rule that prohibited employees from bringing intoxicants or narcotics onto company property or consuming them on company property. *Id.* Finding the evidence insufficient to establish that the employee had used or possessed marijuana on company property, the arbitrator upheld the employee's grievance and ordered the company to reinstate the employee with backpay and full seniority. *Id.* at 34, 108 S.Ct. at 368–69. The district court reversed the award and the Fifth Circuit affirmed, holding that reinstatement would violate the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." *Id.* at 34–35, 108 S.Ct. at 369.

The Supreme Court reversed, finding that the Fifth Circuit had failed to establish a public policy violation. *Id.* at 45, 108 S.Ct. at 374–75. First, the Supreme Court stated that the Fifth Circuit had not drawn its conception of a public policy from existing laws and legal precedents, but had relied instead on its own considerations of the public interest. *Id.* at 44, 108 S.Ct. at 374. Second, the Court held that even if the court of appeals had established a public policy against the operation of dangerous machinery by persons under the influence of drugs or alcohol, the Fifth Circuit had engaged in impermissible factfinding in order to find a violation of that policy. *Id.* at 44–45, 108 S.Ct. at 374–75. Specifically, the Court concluded that the Fifth Circuit had necessarily, but inappropriately, inferred that the employee had in fact used drugs on company property and would do so again in the future while operating dangerous machinery. *Id.* Because the arbitrator had made no such findings, the court of appeals overstepped the bounds of its authority to vacate the award on public policy grounds.

In light of the Supreme Court's opinions in *W.R. Grace* and *Misco,* the scope of our analysis becomes clear. We must first identify whether there exists an explicit public policy against the use of drugs by railroad employees. Second, we must determine, all the while carefully observing the Railway Labor Act's proscription against judicial factfinding, whether the Board's reinstatement of Madison to his former position violated the public policy as we have identified it.

■ We have no difficulty in concluding that there exists a well-defined and dominant public policy against a railroad's employment of individuals whose impaired judgment due to the use of drugs or alcohol could seriously threaten public safety. Pursuant to congressional authorization and in response to evidence implicating substance abuse in railroad accidents, the Federal Railroad Administration in 1985 promulgated a comprehensive set of detailed regulations concerning the use of alcohol and drugs by railroad employees. *See* 50 Fed.Reg. 31508 (1985) (codified as amended at 49 C.F.R. Part 219). "The purpose of [the regulations] is to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs." 49 C.F.R. § 219.1.

Specifically, the regulations prohibit railroad employees from using or possessing alcohol or drugs while on duty and from reporting for duty while under the influence of alcohol or drugs. 49 C.F.R. § 219.101; *see also* 49 C.F.R. § 219.102 (prohibiting railroad employees' usage of controlled substances at any time, whether on duty or off, effective October 2, 1989). To identify and remove employees that pose a threat due to alcohol or drug use, the regulations establish a comprehensive scheme of testing. *See* 49 C.F.R. § 219.201 (post-accident testing where the accident involves a fatality, the release of hazardous material, damage to railroad property above specified dollar amounts, or an injury aboard a passenger

train); § 219.301 (reasonable cause testing under numerous circumstances); § 219.501 (pre-employment drug screens); § 219.601 (random drug testing). Moreover, the regulations contain specific actions that a railroad must take after it has determined that an employee has tested positive for drugs or alcohol in violation of the regulations. First, after a positive test result, the railroad must "immediately remove the employee from covered service." 49 C.F.R. § 219.104(a). Additionally, the railroad may not return an employee to service following a positive test until the employee has been evaluated for alcohol or drug dependence, has successfully completed a program of counseling or treatment, and has tested negative for the presence of alcohol or controlled substances. 49 C.F.R. § 219.104(d). Finally, the regulations mandate that a railroad must "exercise due diligence to assure compliance" with all of the substance abuse regulations. 49 C.F.R. § 219.105.

We also conclude that the Board's reinstatement of Madison without determining the likelihood of his working on the railroad in the future under the influence of alcohol or drugs violates the public policy that we have just identified. Union Pacific presented to the Board test results purporting to show that Madison had been under the influence of cocaine, marijuana, and alcohol at the time that he caused a train accident by improperly lining a switch. The Board, however, never considered the validity of the testing procedures or the test results. In the face of such evidence, the Board decided to reinstate Madison without any safeguards to protect the public from the hazard of subsequent accidents that might result from Madison's continued employment, accidents that might well have consequences potentially much more serious than damage to a switch and a few railroad cars.

We emphasize that we have not decided whether Madison was in fact impaired by drugs at the time of the incident in the Cheyenne yard. Moreover, we have not decided that Madison, if addicted to drugs and alcohol, would be unresponsive to treatment so that he may never work on a railroad again. We need not reach either conclusion

to find the Board's award to be contrary to public policy. If the Board had reinstated Madison after finding that the allegedly positive test results were invalid due to faulty testing procedures or some other reason, we would be obliged to enforce the award. *See Misco,* 484 U.S. at 37–39, 108 S.Ct. at 370–71. Alternatively, if the Board had found that Madison had worked under the influence of drugs in the past, but after treatment or counseling could be trusted to return to work without posing a threat to the public, we likewise would be bound to enforce the award. *See id.* Neither of those scenarios, however, is the situation here.

What violates public policy in this case is the Board's decision to reinstate to his former position a railroad employee who poses a significant risk to the public because of his potential for future drug use on the job. *See Iowa Elec. Light & Power,* 834 F.2d at 1429–30 (overturning arbitration award in favor of employee who displayed deliberate disregard for containment systems and regulations at nuclear power plant). Indeed, that rationale underlies the Federal Railroad Administration's entire regulatory scheme to control drug and alcohol abuse. That is precisely why the regulations require drug testing under so many situations and mandate that railroads remove from covered service employees that have tested positive for drugs and alcohol—to prevent employees impaired by drugs or alcohol from imperiling themselves, their co-workers, and, most importantly, the general public.

Additionally, the Board's reinstatement order places Union Pacific at risk of being found in violation of Federal Railroad Administration regulations. The regulations forbid a railroad from returning to service an employee "who has been determined to have violated" the prohibitions against drug and alcohol abuse because of a positive test result until the employee has completed certain steps designed to prevent future incidents of drug and alcohol abuse by on-duty railroad employees. 49 C.F.R. § 219.104(d). Section 219.104(d) requires that before returning to work the employee must be evaluated for alcohol or drug dependency, must successfully complete a counseling or treatment pro-

gram, and must pass toxicological tests for the presence of alcohol or drugs. The Board's award, however, ordered Union Pacific to reinstate Madison to his former position after only a normal back-to-work drug screen and without mandating that Madison and the railroad comply with all of the section 219.104(d) safeguards. If the Federal Railroad Administration were to determine that the purported positive test result was valid and required compliance with section 219.104(d), Union Pacific would face the dilemma of being forced to violate either the terms of the Board's award or federal regulations designed to keep potential abusers of drugs and alcohol out of safety-sensitive railroad jobs.

The union and Madison assert that overturning the Board's award will give railroads a license to violate with impunity rights earned by employees in a collective bargaining agreement whenever there is an allegation of drug use. Specifically, they contend that vacating the Board's award in this case will allow Union Pacific's due process violations to go unpunished. We do not agree that our decision will produce such consequences.

■ Arbitrators remain free to sanction railroads for violating an employee's contractual rights and to determine appropriate remedies within the confines of the collective bargaining agreement. *See International Ass'n of Machinists v. Northwest Airlines,* 858 F.2d 427, 432 (8th Cir.1988) (upholding arbitration award under the Railway Labor Act that imposed punitive penalty on airline for failure to implement training and staffing agreement). As long as the arbitrator's remedy is "rationally explainable as a logical means of furthering the aims of the contract," *id.* at 430, the arbitrator may, for example, impose monetary penalties, order the railroad to reimburse the employee for rehabilitation programs, order reinstatement of the employee to a position in which he poses no danger to the public, or create its own unique sanction to deter overreaching by the employer. *See, e.g., id.* at 432 (upholding punitive monetary penalty); *Delta Air Lines v. Air Line Pilots Ass'n, Int'l,* 861 F.2d 665, 674–75 (11th Cir.1988) (upholding reimburse-

ment for costs of private rehabilitation). Indeed, where the arbitrator makes a rational finding that the employee discharged for violation of the alcohol and drug regulations can be trusted to refrain from using drugs and alcohol on the job again, the arbitrator may reinstate the employee to his former position, and we will be obliged to affirm the award. *See Misco,* 484 U.S. at 45, 108 S.Ct. at 374–75. The only option that we have foreclosed today on public policy grounds is the reinstatement of a railroad employee to a safety-sensitive position in those cases in which the employee poses a significant risk to the public because of the danger of future substance abuse.

We now turn to the district court's decision to remand this case for a second on-property hearing on the merits of the Rule G allegations. The union and Madison argue that the district court acted without authority in ordering a second hearing. Moreover, they assert that the practical effect of the order would be to forgive Union Pacific's due process violations in conducting the first hearing, a decision that belongs solely to the arbitrator. We agree.

The review provisions of the Railway Labor Act expressly authorize a district court to remand the case to the public law board. 45 U.S.C. § 153 First(q) ("The court shall have jurisdiction to affirm the order of the [adjustment board] or to set it aside, in whole or in part, or it may remand the proceeding to the [adjustment board] for such further action as it may direct."). Section 153 First(q) does not authorize a remand to the company some three years after the incident, however, when the collective bargaining agreement requires that on-property hearings be held within five days of when charges are brought against an employee. The district court's remand order would amount to an interpretation or modification of the parties' agreement, which would do violence to the rule that it is the arbitrator's duty to interpret the agreement. *See Brotherhood of Maint. of Way Employees v. Chicago & N.W. Transp. Co.,* 827 F.2d 330, 333 (8th Cir.1987) (citations omitted), *cert. denied,* 485 U.S. 988, 108 S.Ct. 1291, 99 L.Ed.2d 502 (1988); *see also* 45 U.S.C. § 153 First(i).

Moreover, a remand to the company for a second hearing solely on the merits of the Rule G violation would overstep the bounds of public policy review. As the Supreme Court held in *Misco,* reviewing courts are not allowed to make factual findings when setting aside arbitration awards on public policy grounds. 484 U.S. at 44–45, 108 S.Ct. at 374–75. The district court's order, in effect, finds either that Union Pacific did not violate Madison's due process rights as guaranteed by the collective bargaining agreement or that the violation was so insignificant that it should be disregarded and a new, properly conducted hearing be held. Either alternative would impermissibly contradict an express finding by the Board.

Accordingly, we reverse that portion of the district court's order remanding the case to the Board. We remand the case to the district court with directions that it remand the case to the Board so that the Board may conduct whatever additional factual investigation it deems necessary and determine whatever remedies it deems appropriate for both Madison's conduct and Union Pacific's procedural improprieties. Whether a remand to the company for a second on-property hearing is necessary or allowable under the collective bargaining agreement is a matter that is left to the Board's discretion.

That portion of the district court's order vacating the Board's award is affirmed. That portion of the order remanding the case to the Board is reversed, and the case is remanded to the district court with the directions set forth above.

McMILLIAN, Circuit Judge, dissenting.

For the reasons discussed below, I cannot agree with the majority opinion's holding that federal courts can vacate arbitration awards under the Railway Labor Act on public policy grounds. Accordingly, I would reverse the decision of the district court and enforce the decision of the Board reinstating the employee, subject to the usual back-to-work examination, and awarding him back pay less 90 days for mishandling the switch.

Whether there is a public policy exception under the Railway Labor Act is a difficult question. On the one hand, as noted by the majority opinion, the scope of judicial review of arbitration awards under the Railway Labor Act is "among the narrowest known to the law." *International Ass'n of Machinists v. Northwest Airlines, Inc.,* 858 F.2d 427, 429 (8th Cir.1988). The Railway Labor Act limits judicial review of arbitration awards to three specific grounds: (1) failure of the board to comply with the requirements of the Railway Labor Act, (2) failure of the board to conform or confine itself to matters within the scope of its jurisdiction, and (3) fraud or corruption. 45 U.S.C. § 153 First (q). The Supreme Court has emphasized that arbitration awards under the Railway Labor Act "may be set aside only for the three reasons specified therein" and that "this statutory language means just what it says." *Union Pacific R.R. v. Sheehan,* 439 U.S. 89, 93, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978) (per curiam) (citations omitted).

On the other hand, as also noted by the majority opinion, courts must refuse to enforce private contracts, including collective bargaining agreements and arbitration awards, where enforcement would violate the law or would be contrary to public policy. *Hurd v. Hodge,* 334 U.S. 24, 34–35, 68 S.Ct. 847, 852–53, 92 L.Ed. 1187 (1948). The Supreme Court discussed the public policy exception at some length in *W.R. Grace & Co. v. Local Union 759, International Union of United Rubber, Cork, Linoleum, & Plastic Workers,* 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) (*W.R. Grace* ), and *United Paperworkers International Union v. Misco, Inc.,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) (*Misco* ). Whether an arbitration award violates public policy is a legal question. *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183–84. The public policy in question must be explicit, well-defined and dominant, and ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Misco,* 484 U.S. at 43, 108 S.Ct. at 373, *citing W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183. "Precisely because [the public

policy exception] allows courts to by-pass the normal heavy deference accorded to arbitration awards and potentially to 'judicialize' the arbitration process, the judiciary must be cautious about overruling an arbitration award on the ground that it conflicts with public policy." *E.I. DuPont de Nemours & Co. v. Grasselli Employees Independent Ass'n of East Chicago, Inc.,* 790 F.2d 611, 615 (7th Cir.), *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986).

The problem is that *W.R. Grace* and *Misco* were not decided under the Railway Labor Act but under the National Labor Relations Act (NLRA). Neither *W.R. Grace* nor *Misco* refers to the Railway Labor Act or *Union Pacific R.R. v. Sheehan.* Most of the cases that have applied the public policy exception do not involve the Railway Labor Act. *See, e.g., Stead Motors v. Automotive Machinists Lodge No. 1173,* 886 F.2d 1200 (9th Cir.1989) (banc), *cert. denied,* 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990); *Iowa Electric Light & Power Co. v. Local Union 204, IBEW,* 834 F.2d 1424 (8th Cir.1987). As noted by the majority opinion, the handful of cases that involved the Railway Labor Act assumed without much analysis that the public policy exception applied. *See* op. at 260 n. 4 (citing cases). I have found only one case that expressly refused to recognize a public policy exception under the Railway Labor Act. *Union Pacific R.R. v. United Transportation Union,* 820 F.Supp. 1198 (D.Neb. 1993), *appeal docketed,* No. 93–2119 (8th Cir. May 4, 1993).[1]

Absent some affirmative indication from the Supreme Court or Congress, I am unwilling to add the public policy exception to the narrow scope of judicial review of arbitration awards under the Railway Labor Act. The limited grounds for review are specified in the Railway Labor Act and the Supreme Court has stated that the statutory language means what it says. I am also reluctant to draw an analogy between the NLRA and the Railway Labor Act in order to transplant the public policy exception from one statute to the other. Although the Supreme Court has referred to the NLRA and other federal labor laws for assistance in construing the Railway Labor Act, the two statutory schemes are not the same, and cases decided under the NLRA are not necessarily controlling under the Railway Labor Act. *See, e.g., Air Line Pilots Ass'n v. O'Neill,* 499 U.S. 65, 80–81, 111 S.Ct. 1127, 1137, 113 L.Ed.2d 51 (1991); *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 383, 392, 89 S.Ct. 1109, 1117–18, 1123 (1969).

Because Union Pacific's public policy objection to the board's decision does not fall within any of the three limited categories of judicial review specified by the Railway Labor Act, I would reverse the decision of the district court and enforce the decision of the board reinstating the employee, subject to the usual back-to-work examination, and awarding him back pay less 90 days for mishandling the switch. There has been no alleged fraud or corruption on the part of the board, and the board did not fail to comply with the Railway Labor Act or exceed its jurisdiction. The board did not reach the merits of the Rule G violation, that is, whether the employee had used alcohol or controlled substances, because it found that the hearing officer had abandoned his role as factfinder and, as a result, the employee had been denied the fair hearing prior to administering discipline to which he was entitled under the rules set forth in the collective bargaining agreement.

1. The facts in that case are similar to those in the present case. A railroad employee tested positive for cocaine. A hearing was conducted and he was found to have violated Industry Rule G and was discharged. Certain procedural irregularities occurred at the hearing. The union appealed on procedural grounds and the matter was submitted for arbitration to a public law board. The board found that one of the procedural irregularities had fatally tainted the proceedings and required reversal. The board noted that it could not reinstate the employee to train service without safeguards in light of his cocaine use. The board awarded the employee backpay and conditioned his reinstatement upon participation in the railroad's substance abuse rehabilitation program. The railroad objected and sought to vacate the award on public policy grounds. The union argued that the scope of judicial review of arbitration awards under the Railway Labor Act did not include the public policy exception.

Finally, even assuming that there is a public policy exception under the Railway Labor Act, I would argue that the focus should be on whether the award, not the underlying misconduct, violates an explicit, well-defined and dominant public policy ascertained by reference to laws and legal precedent. *See Stead Motors v. Automotive Machinists Lodge No. 1173,* 886 F.2d at 1215–17 (plurality) (Reinhardt, J.) ("the critical inquiry is not whether the underlying act for which the employee was disciplined violates public policy, but whether there is a public policy barring *reinstatement* of an individual who has committed a wrongful act"). Accepting for purposes of analysis that there is an explicit, well-defined and dominant public policy which is sufficiently based in laws and legal precedents against alcohol or drug use by employees on the job, I do not agree that that public policy would necessarily bar reinstatement of an employee who engaged in that sort of conduct in the past but who has since been rehabilitated. *See Delta Air Lines, Inc. v. Air Line Pilots Ass'n,* 861 F.2d 665, 674 (11th Cir.1988) ("There is no public policy against rehiring former alcoholics, post-rehabilitation."), *cert. denied,* 493 U.S. 871, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989); *Northwest Airlines, Inc. v. Air Lines Pilots Ass'n,* 808 F.2d 76, 83–84 (D.C.Cir.1987) (enforcing award reinstating former alcoholic pilot who had been recertified by FAA for flight duty), *cert. denied,* 486 U.S. 1014, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988). Here, the board conditioned reinstatement of the employee upon the employee's successfully passing the "usual back-to-work examination" which includes drug screening.