**Ronald I. GOFF, Petitioner,**

v.

**DAKOTA, MINNESOTA & EASTERN RAILROAD CORPORATION, a Delaware Corporation, Respondent.**

**No. CIV 99–5018–KES.**

United States District Court, D. South Dakota.

Dec. 8, 2000.

Robert L. Morris, Day, Morris & Schreiber, LLP, Belle Fourche, for Ronald I. Goff, plaintiffs.

Brian J. Donahoe, Mark Edward Salter, Cutler, Donahoe & Mickelson, Sioux Falls, for Dakota, Minnesota & Eastern Railroad Corporation, defendants.

## MEMORANDUM OPINION

SCHREIER, District Judge.

### PROCEDURAL HISTORY

[¶ 1] Petitioner Ronald I. Goff seeks judicial review of the arbitration decision of the Public Law Board (Board) pursuant to the Railway Labor Act, 45 U.S.C. § 151–188. Goff argues that the Board's decision was the result of fraud and was entered without procedural due process. The employer, Dakota, Minnesota & Eastern Railroad Corporation (DM & E), filed a counterclaim seeking enforcement of the

award, or in the alternative, that the Board decision be vacated on public policy grounds. DM & E moved for summary judgment. Following this court's denial of summary judgment and order of remand on January 11, 2000, DM & E moved this court for reconsideration. The court granted DM & E's motion for reconsideration and denied DM & E's motion for summary judgment. The court scheduled an evidentiary hearing which was conducted on July 21, 2000. The court makes the following evidentiary findings:

[¶ 2] Goff was a locomotive engineer for DM & E. On August 22, 1995, a portion of the train Goff was operating derailed near New Underwood, South Dakota, ultimately causing $40,800 in structural and equipment-related damage. There were no fatalities, injuries, passengers, or hazardous materials involved in the derailment. Following examination of a print out of the train derailment site from locomotive 6362, no exceptions were taken to Goff's train handling following the derailment. The cause of the derailment was ultimately found to be interaction of lateral/vertical forces (harmonic rock off).

[¶ 3] Following the derailment, Goff and the crew continued to operate the train for two and a half hours. At the end of the shift change, the crew, including Goff, was shuttled from Owanka to the DM & E train depot in Rapid City. Upon arrival at Rapid City, the crew was told by the conductor that they were to accompany the roadmaster for required post-accident toxicological testing. Goff confirmed with Les Swanson, the operations supervisor, that the crew was to undergo required post-accident toxicological tests. The crew was then transported to the Rapid Care Clinic at Rapid City where both urine and blood samples were taken for toxicological testing. The laboratory technician used a Federal Drug Testing Custody and Con-

trol form to submit the samples for testing and checked "Post–Accident" as the reason for the test.

[¶ 4] Goff was the third and last person of the crew tested. Goff was not told to wash and dry his hands prior to providing a urine specimen. Goff was unable to view the splitting of the urine specimen and was told to initial the identification labels and seals prior to their attachment to the specimen bottles.

[¶ 5] On August 29, 1995, DM & E was notified that Goff's urine sample tested positive for the presence of marijuana metabolites, or THC. On or about that same day, Goff was told by Robert Irwin, Vice President of Transportation at DM & E and the random drug testing program administrator for DM & E, that his post-accident toxicological test of August 22 was positive and he was removed from service pending a hearing. Goff requested that the split sample of the urine be tested at a different laboratory. The re-test indicated a 66 percent increase in the amount of THC in the split sample as compared to the sample tested initially.

[¶ 6] DM & E conducted a post-suspension hearing beginning on September 20, 1995, at 1 p.m., but adjourned at 2:20 p.m. due to the unavailability of the Medical Review Officer. The hearing reconvened on October 3, 1995. Present at the hearing was Goff; Teresa Norby, DM & E Account Technician; K.R. Hatfield, DM & E Trainmaster; Richard Dutcher, President & Conductors Local Chairman; and Clyde Mittleider, Locomotive Engineers Local Chairman. The presiding hearing officer was Robert Irwin, DM & E's Vice President of Transportation, who was also DM & E's charging official at the post-suspension hearing, DM & E's random drug testing program administrator, DM & E's official who ordered the testing after the train

derailment, and DM & E's highest appeals officer.

[¶ 7] At the hearing, Dutcher asked Trainmaster Hatfield numerous questions regarding the post-accident testing. For instance, when asked if he knew of any other post-accident testing, Hatfield indicated that he did not. Hatfield was also asked if this post-accident toxicological test followed Federal Railway Authority (FRA) guidelines and he gave an unresponsive answer. Hatfield never objected to Dutcher's use of the words "post-accident." Following Dutcher's questioning of Hatfield, Irwin called for a short recess.

[¶ 8] During the recess, Irwin, the presiding official, and Hatfield, a witness, left the hearing room together and went into an adjoining conference room for ten minutes. After the recess, Irwin, on the record, asked Hatfield if Goff's drug and alcohol testing was conducted under FRA authority to which Hatfield replied, "No." Irwin then asked if the testing was conducted under railroad authority to which Hatfield replied, "Yes." This questioning effectively changed DM & E's previous position that it tested Goff pursuant to FRA rules, regulations, and guidelines, to now contending that it tested Goff pursuant to company policy. DM & E took the position that the lab technician checked the wrong box on the federal form, and this clerical error led to the misperception that the test was done pursuant to the FRA.

[¶ 9] During the post-suspension hearing, when Hatfield was asked who ordered the post-accident drug test, he indicated that he did not know. DM & E did not produce this information. Irwin, the chief hearing officer, did not volunteer that he was the person who ordered the test. At the conclusion of the hearing, Irwin found against Goff and recommended his dismissal.

[¶ 10] Goff appealed this decision. Irwin served as the highest appeal and review official pursuant to the Collective Bargaining Agreement. Goff again raised the question of who ordered the drug tests, and Irwin stated that the operation supervisor on duty informed the crew about the tests. Irwin again did not volunteer that he ordered the tests. Irwin, as the appeals officer, upheld the decision he made as chief hearing officer.

[¶ 11] Goff requested arbitration before the Board pursuant to 45 U.S.C. § 157. Sitting on the Board were James McIntyre, carrier member; Bruce Wigent, organization member; and Robert Peterson, chairman and neutral member. James McIntyre was the president and chief executive officer of DM & E. The Board reviewed the record of the post-suspension hearing and did not hear new evidence. Included in the record of the post-suspension hearing was a transcript of the audio tapes recorded at the post-suspension hearing. The transcript was completed at the direction and expense of DM & E and DM & E submitted the transcript to the Board.

[¶ 12] During the arbitration proceedings, Goff alleged that the drug test results were not admissible evidence because he had been wrongfully subjected to a drug test under the Federal Railway Administration Post–Accident Toxicological Test rules. When Goff asked who ordered the drug test during the Board hearing, Board member McIntyre shrugged his shoulders and raised his palms upward. DM & E admitted that it did not have authority to subject Goff to drug tests under the FRA, but claimed that the drug tests were conducted pursuant to its company policy. In reaching the conclusion that the drug tests were conducted pursuant to company policy, the Board found persuasive the evidence that the notice of hearing sent to

Goff by DM & E charged Goff with a violation of company policy and not a violation of the FRA guidelines, and that the rescheduling notice also charged a violation of company policy. At neither time did Goff object to the way in which the charge was worded. The Board also noted that Hatfield testified that the drug testing was ordered pursuant to the carrier's drug and alcohol policies and rules.

[¶ 13] Goff contended that the laboratory technician's use of a Federal Drug Testing Custody & Control form proved that the test was conducted under the FRA. The Board found that certain actions of the carrier and the laboratory technician's use of the FDTC & C form contributed to the dispute over whether the test was administered under the FRA's or DM & E's rules. The Board found that Goff was drug tested pursuant to DM & E's rules of conduct and that he tested positive for the prohibited substance marijuana.

[¶ 14] Goff contended that the Locomotive Engineer Review Board's (LERB's) decision to overturn DM & E's revocation of Goff's engineer certification should result in the exoneration of Goff in this action. In a separate administrative action, the LERB reinstated Goff's engineer certification. The Board determined the LERB action alone did not overcome DM & E's finding that Goff violated operating and safety rules. The Board found that the decision of the LERB did not preempt or alter DM & E's authority to terminate Goff.

[¶ 15] After making its findings, the Board ordered that Goff be reinstated as a locomotive engineer at DM & E contingent upon his passing a company medical/physical examination including a drug screening test. Goff was granted his seniority and "other benefits" unimpaired. As part of his continued employment, Goff was also subject to unannounced random drug and alcohol tests for a period of 60 months with future violations of any test resulting in termination of Goff's employment. Goff's request for back pay was denied. The Board issued its opinion on May 7, 1997.

[¶ 16] On February 16, 1996, Goff filed a request under the Freedom of Information Act (FOIA) seeking copies of documents from the investigation that was conducted by the Federal Railroad Administration into irregularities that occurred during the drug testing. Goff received the requested information on May 13, 1997, six days after the Board's decision was issued. Documents released under the FOIA indicate that during the FRA investigation, Irwin admitted to the FRA investigators that he ordered the drug tests. These documents also reveal that at the conclusion of this investigation, the FRA determined that DM & E violated 49 C.F.R. § 219 .104(c)(1) when it authorized Irwin to be the charging official as well as serve as the presiding officer at Goff's post-suspension hearing.

## ANALYSIS

[¶ 17] Under the Railway Labor Act (RLA), the district court has jurisdiction to affirm the order of the Board or set it aside, in whole or in part, or it may remand the proceeding to the Board for such further action as it may direct. 45 U.S.C. § 153 First(q).

[¶ 18] The Railway Labor Act was passed by Congress to promote stability in relations between labor and management by establishing a comprehensive framework to peacefully resolve labor disputes. *See Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 252, 114 S.Ct. 2239, 2243, 129 L.Ed.2d 203 (1994); *Atchison, Topeka & Santa Fe Ry. v. Buell,* 480 U.S. 557, 562, 107 S.Ct. 1410, 1414, 94 L.Ed.2d 563 (1987); *see also* 45 U.S.C. § 151a.

[¶ 19] The RLA recognizes two separate classes of disputes. *See Hawaiian Airlines,* 512 U.S. at 252–53, 114 S.Ct. 2239. The first class is major disputes which relate to the formation of collective bargaining agreements or efforts to secure a collective bargaining agreement. *See id.; Consolidated Rail Corp. (Conrail) v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 302, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989); *Elgin, J. & E. Ry. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). The second class is minor disputes which deal with disputes arising out of the interpretation or application of agreements regarding rates of pay, rules, or working conditions. *See Hawaiian Airlines,* 512 U.S. at 253, 114 S.Ct. 2239.

[¶ 20] Goff and DM & E agree the present matter is a minor dispute. The claim involves an interpretation of the collective bargaining agreement. Minor disputes must be resolved only through mechanisms created by the RLA. *See Hawaiian Airlines,* 512 U.S. at 253, 114 S.Ct. 2239. A minor dispute in the railroad industry is subject to binding and compulsory arbitration before the National Railroad Adjustment Board (NRAB), or before any adjustment board established by the employer and the union representing the employees. *See Conrail,* 109 S.Ct. at 2481, 109 S.Ct. 2477. The NRAB, which includes adjustment boards, has exclusive jurisdiction over minor disputes. *Id.*

[¶ 21] Judicial review of the arbitral decision is extremely narrow. *See id.; Union Pac. R.R. v. Sheehan,* 439 U.S. 89, 91, 99 S.Ct. 399, 401, 58 L.Ed.2d 354 (1978) (per curiam). Such review should be among the narrowest known to law. *See Sheehan,* 439 U.S. at 91, 99 S.Ct. 399; *Union Pac. R.R. v. United Transp. Union,* 3 F.3d 255, 258 (8th Cir.1993). Because of the congressional intent to create a comprehensive regulatory scheme, there are very few circumstances in which a district court has jurisdiction to review a public law board determination. *See Sheehan,* 439 U.S. at 93, 99 S.Ct. 399.

[¶ 22] The RLA limits judicial review of arbitration decisions to three specific grounds: (1) failure of the board to comply with the provisions of the RLA; (2) failure of the board to conform or confine itself to matters within the scope of its jurisdiction; or (3) fraud or corruption by a member of the board making the order. 45 U.S.C. § 153 First (q). *See also Sheehan,* 439 U.S. at 93, 99 S.Ct. 399.

[¶ 23] The first ground upon which the court may set aside the Board's order is the Board's failure to comply with the provisions of the Railway Labor Act, 45 U.S.C. § 153 First (q). The RLA includes 46 U.S.C. §§ 151–163; §§ 181–185, § 186 note, § 187, and § 188. Pursuant to 45 U.S.C. § 157(b), a public law board is "bound to give the parties to the controversy a full and fair hearing, which shall include an opportunity to present evidence in support of their claims. . . ." In this case, the court finds that the Board failed to comply with the provisions of the RLA. The Board did not give Goff a full and fair hearing because Board member McIntyre, by shrugging his shoulders when asked who ordered the drug tests, denied Goff the opportunity present crucial evidence, Irwin's testimony, at the Board hearing.

[¶ 24] At the time of the Board hearing, McIntyre was DM & E's president and chief executive officer. He held that position from 1986 through 1996 and is currently a member of the DM & E board of directors. As president and CEO, McIntyre held weekly Monday morning meetings with his department heads, including Irwin. McIntyre testified that he strongly suspected that Irwin brought up the

subject of Goff being involved in the derailment at the Monday morning meeting following the derailment because a derailment with positive drug test incident "is quite serious in the railroad business." The court presumes that McIntyre also learned at that meeting, on August 28, 1995, that it was Irwin who ordered the drug test.

[¶ 25] McIntyre claims in his deposition that he does not recall making the shrugging gesture. He testified that it was common knowledge that Irwin ordered the tests and that he does not know why he would have written to Senator Tom Daschle's representative, Judith Christensen, that "Mr. Goff's statement that Mr. Irwin was the DM & E's official responsible for ordering the test is without proof or documentation," because the statement was not accurate.

[¶ 26] DM & E had several opportunities to disclose the identity of the person ordering the drug tests to Goff to allow for a full and fair hearing before the Board: Hatfield was asked and denied knowing who ordered the test; Irwin was asked and gave an evasive answer as to who ordered the test; and McIntyre was asked and denied knowing who ordered the test.

[¶ 27] McIntyre's shrug, an affirmative act of a Board member during the Board hearing, prevented Goff from presenting Irwin's testimony and prevented Goff from presenting evidence to indicate the facts upon which Irwin relied in determining whether there was reasonable cause for the drug test. In addition, because Irwin did not testify before the Board, it could not determine if reasonable cause existed for the drug test. Therefore, the court finds that the Board's failure to comply with the provisions of the RLA is a justification for this court to vacate the Board's decision.

[¶ 28] The second ground upon which the court could vacate the Board's decision is for failure of the board to conform or confine itself to matters within the scope of its jurisdiction. 45 U.S.C. § 153 First (q). The court finds that this ground does not apply.

[¶ 29] The third ground upon which the court could vacate the Board's decision is fraud or corruption by a member of the Board making the order. 45 U.S.C. § 153 First (q). The RLA does not define fraud. The Ninth Circuit Court of Appeals in *Pacific & Arctic Ry. v. United Transp. Union*, 952 F.2d 1144 (9th Cir.1991), recognized that fraud was established at common law if it was proved that the alleged fraudulent party made false representations of material fact which were intended to induce the other party to act, that the representations were made with the knowledge of, or reckless disregard for, their falsity and the other party justifiably relied upon these false representations to its detriment. *Id.* at 1147.

[¶ 30] Fraud must be proved by clear and convincing evidence and cannot be discoverable by due diligence before or during the proceeding. *Id.*, Federal Arbitration Act, 9 U.S.C. § 10(a), and Federal Rule of Civil Procedure 60(b)(3). A finding of fraud under the RLA demands "a greater level of improper conduct" than the common law level to establish fraud. *Id.* Because of the strong federal policy favoring arbitration, fraud can only be established by clear and convincing proof of an extremely high degree of improper conduct such as dishonesty. *See id.* Obtaining an award by perjured testimony also constitutes fraud. *See Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293 (9th Cir. 1982).

[¶ 31] The type of fraud contemplated by the RLA is "the so-called 'extrinsic' fraud that will cause the innocent

party to lose regardless of its argument because the case is not decided on its merits." *Hankin v. National R.R. Passenger Corp.*, 1987 WL 20136 (N.D.Ill. 1987) (citing *Pitts v. National R.R. Passenger Corp.*, 603 F.Supp. 1509, 1517 (N.D.Ill.1985)). "Extrinsic fraud occurs when the carrier representative either knowingly 'fails to disclose that perjured testimony is being offered before the board' or bribes the neutral board members." *Id.* at \*2. "The Act allows review of Board awards tainted by this type of fraud to enable the 'district court to correct errors not preventable by the litigants themselves.'" *Id.*

[¶ 32] In this case, the fraud issue overlaps factually with the first ground for vacating the Board's decision. Because fraud occurs when a carrier representative knowingly fails to disclose that perjured testimony is being offered before the Board, it can be inferred that fraud also occurs when a Board member, McIntyre, knowingly intends to deceive the neutral Board member. McIntyre's shrug fraudulently induced the neutral Board member into believing that McIntyre did not know who ordered the drug tests following the derailment, even though McIntyre knew (he later says it was "common knowledge") that Irwin ordered the drug tests. Although Goff suspected it was Irwin who had ordered the testing, McIntyre's letter to Senator Daschle's representative indicated that "Goff's statement that Mr. Irwin was the DM & E Official responsible for ordering the test is without proof or documentation." In his deposition, McIntyre admits that he knew Irwin ordered the test and does not know why he would have told Ms. Christensen of Senator Daschle's office otherwise. By his choice of words, McIntyre intentionally deceived both Senator Daschle's office and Goff into thinking that it was not Irwin who ordered the test.

[¶ 33] The same inference can be made about McIntyre's shoulder shrug at the Board hearing; he intended to deceive the neutral member and fraudulently induce him into believing that he did not know who ordered the test. McIntyre's shrug, an affirmative act, was a false representation made to the Board by McIntyre when he knew of its falsity. That answer, an "I do not know" shrug, was untruthful because McIntyre did know who ordered the test. Furthermore, it was only after the Board issued its ruling that Goff discovered through the FOIA materials that Irwin was the person who ordered the drug tests. Therefore, the court finds that McIntyre's fraudulent behavior was not discoverable through Goff's due diligence before or during the Board hearing. Accordingly, the court finds that there was fraud by a Board member and that the fraud is also justification for this court to vacate the Board's decision.

[¶ 34] In addition to the statutory grounds for district court review of arbitration awards, a district court may vacate a Board award if a violation of procedural due process has occurred. *See Union Pac. R. v. Price*, 360 U.S. 601, 616, 79 S.Ct. 1351, 3 L.Ed.2d 1460 (1959); *Armstrong Lodge No. 762 v. Union Pac. R.R.*, 783 F.2d 131, 135 (8th Cir.1986).

[¶ 35] An employee's due process rights should be protected in proceedings before the NRAB and associated entities because the tribunal was created by Congress to resolve certain disputes in the railroad industry. Thus, its decisions are that of government and must not deprive anyone of life, liberty, or property without due process of law. *See Shafii v. PLC British Airways*, 22 F.3d 59 (2d Cir.1994); *English v. Burlington Northern R.R.*, 18 F.3d 741 (9th Cir.1994).

■ [¶ 36] Courts which have allowed judicial review of Board awards on due process grounds restrict the review to actions taken by the Board. *See English*, 18 F.3d at 744. For purposes of the RLA, due process requires that (1) the Board be presented a "full statement of the facts and all supporting data bearing upon the disputes," 45 U.S.C. § 153 First(i), and (2) the parties must be heard either in person, by counsel, or by other representatives and the Board must give due notice of all hearings to the employee. 45 U.S.C. § 153 First(j). *See also English*, 18 F.3d at 744.

[¶ 37] The Eighth Circuit has not articulated the due process requirements under the RLA, but has outlined the requirements of procedural due process in a public employee termination scenario. In *Agarwal v. Regents of the University of Minnesota*, 788 F.2d 504 (8th Cir.1986), the following requirements of procedural due process were identified:

1.  clear and actual notice of the reasons for termination in sufficient detail to enable him or her to present evidence relating to the reasons for termination;
2.  notice of both the names of those who have made allegations against the employee and the specific nature and factual basis for the charges;
3.  a reasonable time and opportunity to present testimony in his or her own defense; and
4.  a hearing before an impartial board or tribunal.

*Id.* at 508.

■ [¶ 38] The first due process requirement is that the Board be presented a "full statement of facts and all supporting data bearing upon the disputes." 45 U.S.C. § 153(i); *English*, 18 F.3d at 744. The Board did not receive new evidence; it relied upon the transcript of the post-suspension hearing as provided by DM & E. Ordinarily, a transcript of a post-suspension hearing may be considered a full statement of facts. In this case, however, the transcript of the post-suspension hearing as provided by DM & E to the Board is only a partial and biased statement of facts.

[¶ 39] In comparing the audio tape of the post-suspension hearing to the DM & E transcript, the court finds that the transcript reflects neither a complete nor accurate record of the post-suspension hearing. It is suspect that the transcript was provided at the cost and direction of DM & E and provided to the Board as an accurate depiction of the post-suspension hearing. The transcript is wrought with innumerable inaccuracies and glaring deficiencies, most significant of which is the failure of the transcript to reflect the ten-minute recess called by Irwin during which he met with Hatfield. Immediately following the recess, DM & E's position changed regarding under which authority Goff's testing was ordered. More importantly, the Board found Hatfield's testimony that the testing was ordered under company authority significant and explicitly cited it in the award.

■ [¶ 40] In addition, it cannot be said that the Board was presented a full statement of the facts and all supporting data bearing upon the disputes because DM & E refused to disclose that Irwin was the person who ordered the tests. This refusal to disclose thwarted Goff's opportunity to present Irwin's testimony before the Board, including Irwin's factual basis to support reasonable cause testing under the company authority. Therefore, the court finds that the due process requirements pursuant to 45 U.S.C. § 153(i) have not been met.

[¶ 41] Furthermore, the court also finds that the due process requirements as articulated by the Eighth Circuit Court of Appeals have not been met. Specifically, the second requirement that notice of both the names of those who have made allegations against the employee and the specific nature and factual basis for the charges be given has not been met. There is no dispute that Goff was unable to discover who ordered the drug tests until his FOIA request revealed Irwin's FRA interview.

[¶ 42] Again, because Irwin's identity as the person who ordered the drug tests was not disclosed prior to the arbitration hearing, Goff was denied the opportunity to effectively cross-examine the person who was making the allegations against him. The information known by Irwin at the time that he ordered the drug tests was relevant and material evidence for the arbitrators to consider in determining whether DM & E had "reasonable cause" to order the drug tests under the company policy.

[¶ 43] The court also finds that the third Eighth Circuit requirement for due process was not met. Specifically, the nondisclosure of who ordered the drug test prevented Goff the opportunity to present testimony on his own defense.

[¶ 44] In most instances, the informal grievance procedures that precede arbitration before the Board do not merit constitutional protection. *See Elmore v. Chicago & Illinois Midland Ry.*, 782 F.2d 94 (7th Cir.1986); *Steffens v. Brotherhood of Ry.*, 797 F.2d 442 (7th Cir.1986). Here, however, the parties did not present new evidence during the arbitration hearing and the Board relied upon the record created during the post-suspension hearing. The requirement that the presiding officer be someone other than the charging official is required by federal regulation rather than a private negotiated agreement between the parties and thus can be the basis for a denial of due process allegation. 49 C.F.R. 219.104.

[¶ 45] Specifically, after an investigation, the FRA concluded that Irwin was the individual who charged Goff with violating the alcohol and drug regulations and who removed Goff from service. Irwin was also the person who ordered the drug tests and he admitted that he did so without knowledge of any facts that indicated the derailment was caused by train handling. The FRA found that DM & E violated 49 C.F.R. § 219.104(c)(1), which requires the presiding officer to be someone other than the charging official. *See United Transp. Union v. Union Pacific R.R.*, 116 F.3d 430, 431 (9th Cir.1997).

[¶ 46] Furthermore, DM & E's argument that Goff's drug test was authorized only under company authority which prevents the application of 49 C.F.R. § 219.104 is not persuasive. Evidence indicates that it is DM & E's company policy that after Goff's test was reported positive, then Part 219 applied. *See* Evidentiary Exhibit 10, p.5; Evidentiary Exhibit 13, Exhibit 19, p. 3. McIntyre, DM & E's President and CEO, indicated to Senator Daschle's representative that "once the test was reported positive, it then came under 49 C.F.R. 219.101 . . . ." Likewise, Appleman, DM & E's Chief Mechanical Officer, indicated to Goff that "[o]nce a specimen test is reported positive under the company's rules, the requirements outlined in 49 C.F.R. Part 219 and Part 240 engages [sic] requiring a Carrier to take specific action." Both McIntyre and Appleman made these representations in their official capacities and on behalf of DM & E. No evidence to the contrary has been presented. Therefore, the court finds that it was DM & E's official policy that once Goff's specimen tested positive, Part 219 applied, entitling Goff to a prompt post-suspension hearing

before a presiding officer other than the charging official.

[¶ 47] Consequently, Goff was denied due process by DM & E's failure to disclose prior to the arbitration hearing who ordered the drug tests, by allowing Irwin to act as both the charging official and hearing officer, and by allowing a biased hearing officer to create the record that was then used as the basis for the Board's decision. If Part 219 does not apply, then DM & E could always drug test under company authority without reasonable cause, hold post-suspension hearings in which the presiding hearing officer and the charging officer are the same person who ordered the testing and who would decide the appeal, create an inaccurate and significantly deficient record to bring before the Board, thwarting not only due process, but also the Railway Labor Act and the congressional intent behind it.

[¶ 48] DM & E alleges that the decision by Public Law Board No. 5884 to reinstate Goff violates public policy. Federal courts possess the authority to vacate arbitration awards under the RLA on public policy grounds. *See Union Pac. R.R. v. United Transp. Union,* 3 F.3d 255, 258 (8th Cir.1993). However, a court is not free to overturn any award that it may disagree with. *See id.* at 260; *United Paperworkers Int'l Union, AFL–CIO v. Misco., Inc.,* 484 U.S. 29, 43, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987). A court must rely on existing laws and legal precedents, not its own considerations of the public interest. *See Union Pacific,* 3 F.3d at 261. Additionally, a court may not engage in factfinding beyond that established by the public law board. *See id.*

[¶ 49] The Eighth Circuit has concluded that a well-defined and dominant public policy exists against the employment by the railway of individuals who have impaired judgment due to the use of drugs or alcohol. *See Union Pacific,* 3 F.3d at 261; *Union Pacific,* 23 F.3d at 1400. Such practice may seriously threaten public safety. *See Union Pacific,* 3 F.3d at 261; *Union Pacific,* 23 F.3d at 1400; *see also* 49 C.F.R. § 219.1. The purpose of the regulations is to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs. *See Union Pacific,* 3 F.3d at 261.

[¶ 50] Relying on this legal and precedential standard, however, is not enough. Whether Goff's employment would violate this established public policy is a fact determination which should be made by the Board in the first instance. *See Union Pacific,* 23 F.3d at 1400. It does not appear that the Board made a fact determination regarding whether Goff's judgment was impaired due to the use of drugs and if so, whether such impaired judgment could seriously threaten public safety. This court is not in the position of factfinder regarding a violation of public policy. Therefore, this issue is also remanded to the Board for a determination of the facts related to this public policy issue. *See Union Pacific,* 3 F.3d at 260 (citing *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 44–45, 108 S.Ct. 364, 374–75, 98 L.Ed.2d 286 (1987)). Accordingly, it is hereby

[¶ 51] ORDERED that this matter is remanded to the Board to conduct a further evidentiary hearing consistent with this opinion.