EXXON SHIPPING COMPANY,
A Delaware Corporation,
Appellee,

v.

EXXON SEAMEN'S UNION, Appellant.

No. 92–5489.

United States Court of Appeals,
Third Circuit.

Argued May 19, 1993.

Decided Dec. 8, 1993.

Sur Petition for Rehearing March 9, 1994.

Schneider, Goldberger, Cohen, Finn, Solomon, Miceli, Leder & Montalbano, A Professional Corporation, Howard A. Goldberger (argued and on the brief), Cranford, NJ, for appellant.

---

John F. Tully, Joseph T. Walsh III, Douglas B. Neagli (argued), Exxon Co. U.S.A., Linden, NJ, for appellee.

Before: STAPLETON, ALITO and SEITZ, Circuit Judges.

## OPINION OF THE COURT

ALITO, Circuit Judge:

The Exxon Seamen's Union has appealed from a district court order vacating an arbitration award that required the Exxon Shipping Company to reinstate an able bodied seaman on an oil tanker who was found to be highly intoxicated while on duty. 801 F.Supp. 1379. The district court held that this arbitration award was contrary to the well defined and dominant public policy against having intoxicated persons participate in the operation of commercial vessels. After the district court entered the order at issue here, we upheld a similar district court order vacating an arbitration award that required the reinstatement of an able bodied seaman on another oil tanker who had failed a company drug test. *Exxon Shipping Co. v. Exxon Seamen's. Union,* 993 F.2d 357 (3d Cir.1993) *("Exxon Shipping Co. I").* In light of that decision, we affirm the order now before us.

## I.

In 1985, the Exxon Shipping Company and the Exxon Seamen's Union entered into a collective bargaining agreement that required the arbitration of grievances and provided that the decision of an arbitration panel would be final and binding. In April 1988, after bargaining to an impasse, Exxon Shipping announced that it was implementing certain modifications of this agreement, including a new policy on employee alcohol and drug use. This policy stated that "[b]eing unfit for work because of use of drugs, or alcohol is strictly prohibited and is grounds for termination of employment." The policy also provided that Exxon Shipping had the "right to require employees to submit to medical evaluation or alcohol and drug testing where cause exists to suspect alcohol or drug misuse." [1]

In September 1988, Exxon Shipping sent a letter to all of its oceangoing employees further explaining its alcohol and drug policy. This letter stated that it served as "another official notice that violation of the Company Alcohol and Drug Use Policy, or regulations governing alcohol or drug use in the work place will result in immediate termination from the vessel." The letter added: "While we must continue to thoroughly investigate the facts of each individual case and make a final determination on a case-by-case basis, termination of employment is the penalty for violation of these standards."

Approximately one year later, on September 5, 1989, Exxon Shipping and the union entered into a Memorandum of Understanding modifying the collective bargaining agreement. This Memorandum provided:

A breathalyzer test may be given "for cause" by a supervisor trained to conduct such tests to anyone suspected of intoxication. A .04 or above Blood Alcohol Content (BAC) is considered intoxication and may result in discharge from the vessel and subject the employee to further discipline up to and including termination.[2]

On September 13, 1989, shortly after this memorandum was signed, the Exxon Long Beach, a 987–foot oil tanker used to transport crude oil from Alaska to California, was anchored at San Francisco. One of the able bodied seamen assigned to this ship was Randall Fris. Able bodied seamen have duties that are related to the safe operation of the ship. *See* 33. C.F.R. § 95.015 (1993); 46 C.F.R. § 12.05–9 (1992). At about midnight, Fris returned to the ship and reported for duty.[3] Several officers who observed him

---

1. The policy also encouraged employees suffering from alcohol or drug dependency to seek advice and treatment, and the policy stated that no employee would be terminated or otherwise disciplined for seeking such help.

2. This Memorandum of Understanding provided for different treatment of employees who failed drug tests. The Memorandum stated that if an employee failed a properly administered drug test and did not present to the union any other test result establishing that he or she was drug-free, the union would "accept [the] offense as grounds for termination which is not subject to the grievance and arbitration procedure."

3. Although the vessel was anchored at this time, the district court stated that "Fris nevertheless had obligations and responsibilities which required the exercise of judgment." Dist.Ct.Op. at 34.

believed that he was in an impaired condition. A breathalyzer test was administered,[4] and the test revealed a blood alcohol content of 0.150, more than three times the maximum (0.04) permitted by the Memorandum of Understanding and by Coast Guard regulations. *See* 33 C.F.R. §§ 95.020(b), 95.050(b), 95.055 (1993). The next day, Exxon Shipping discharged Fris.

The union filed a grievance protesting Fris's discharge, and eventually the dispute was submitted to a three-member arbitration panel consisting of a neutral arbitrator and representatives of the company and the union. Over the dissent of the company representative, the panel concluded that Fris's discharge had not been for good cause. The majority agreed that Fris had been intoxicated when he boarded the Exxon Long Beach, but it concluded that the Memorandum of Understanding and the company's alcohol policy, while permitting discharge for such conduct, did not require that result. Relying on Fris's good record during his eight years of employment by Exxon Shipping, the majority concluded that discharge was not the appropriate remedy. The majority stated that "[s]uch an employee should have been given an opportunity to demonstrate that the events on September 13, 1989 were an aberration, and that they would not occur again." App. at 50. The majority determined that the appropriate penalty was a 90–day suspension and directed Exxon Shipping to reinstate Fris to his prior position with back pay. The award did not require Fris to undergo any type of rehabilitation, treatment, or counselling.

Exxon Shipping then filed this action in the United States District Court for the District of New Jersey, seeking to have the arbitration award vacated. The district court granted summary judgment for Exxon Shipping, concluding that the award was contrary to "a well defined and dominant public policy against having intoxicated persons operate commercial vessels." Dist.Ct.Op. at 25. The court relied on a Coast Guard regulation prohibiting the operation of a vessel while intoxicated, as well as "a myriad of regula-

tions from various Government agencies concerning alcohol and drug use in the workplace." *Id.* at 26. Noting that Fris "was not a desk-bound employee" but had "significant responsibilities for the operation of a large, ocean-going oil tanker," the court stated: "With an excess of three to four times the blood alcohol permitted by Exxon and the Coast Guard, Fris would be hard pressed to exercise the judgment and discretion required even on a moored oil tanker." *Id.* at 34–35. The court added that if Fris were involved in an accident while intoxicated, "Exxon would be hard put to explain or justify his employment." *Id.* at 35. The court observed that "[t]here is no margin for error in the operation of an oil tanker." *Id.* at 36. The court continued: "A mistake is usually catastrophic in terms of loss of life, damage to the environment, or destruction of property. A mistake caused by or clouded by an excessive level of alcohol in the system of a worker is simply unacceptable." *Id.*

After the district court entered its order vacating the arbitration award, the union took this appeal.

## II.

A. In *W.R. Grace & Co. v. Local Union 759, International Union of the United Rubber Workers of America,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983), the Supreme Court stated that "[a]s with any contract, ... a court may not enforce a collective-bargaining agreement that is contrary to public policy." The Court cautioned, however, that "[s]uch a public policy ... must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id.* (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)).

Several years later, in *United Paperworkers International v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 369–70, 98 L.Ed.2d 286 (1987), a union argued that "an arbitral award may not be set aside on public policy

---

4. This test was authorized by the provision of the Memorandum of Understanding quoted above and by 33 C.F.R. § 95.035(a)(2) (1993).

grounds unless the award orders conduct that violates the positive law." The Court found it unnecessary to reach this argument, however, because the Court found that the court of appeals decision under review did not comply with the minimum standards set out in *W.R. Grace & Co. See Misco,* 484 U.S. at 45 n.12, 108 S.Ct. at 374 n.12.

*Misco* involved an employee who operated a machine that used sharp blades to cut rolls of paper. The employee was found in the backseat of a car in the company parking lot "with marijuana smoke in the air and a lighted marijuana cigarette in the frontseat ashtray." *Id.* at 33, 108 S.Ct. at 368. In addition, marijuana gleanings were discovered in the employee's car, and marijuana was found in his home. *Id.* After learning these facts, the company discharged him, but an arbitrator ordered his reinstatement. The district court, however, refused to enforce the award, and the court of appeals affirmed, holding that reinstatement would violate the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." 768 F.2d 739, 743 (5th Cir. 1985). The Supreme Court reversed, stating that the court of appeals had "made no attempt to review existing laws and legal precedents in order to demonstrate that they establish a 'well-defined and dominant' policy against the operation of dangerous machinery while under the influence of drugs." *Misco,* 484 U.S. at 44, 108 S.Ct. at 374. The Court also stated that even if the court of appeals' formulation of public policy were accepted, "no violation of that policy [had been] clearly shown" in that case because there was insufficient evidence that the employee would have operated his machine under the influence of drugs. *Id.*

While *Misco* left open the question whether an arbitration award may be set aside on public policy grounds only when enforcement of the award would violate positive law, two recent decisions of our court have explicitly or implicitly rejected that argument. In *Stroehmann Bakeries v. Local 776, International Brotherhood of Teamsters,* 969 F.2d 1436 (3d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 660, 121 L.Ed.2d 585 (1992), the employer discharged a deliveryman after determining that he had sexually harassed a customer's employee, but an arbitrator or-

dered the deliveryman's reinstatement. The arbitrator did not decide whether sexual harassment had actually occurred, but the arbitrator concluded that the employer had not made an adequate investigation. The district court vacated the award, and we affirmed. Looking to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) (1988), an Equal Employment Opportunity Commission regulation, 19 C.F.R. § 1604.-11(a) (1993), the Supreme Court's decision in *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64–67, 106 S.Ct. 2399, 2404–06, 91 L.Ed.2d 49 (1986), and other authorities, we found that "[t]here is a well-defined and dominant public policy concerning sexual harassment in the workplace." *Stroehmann Bakeries,* 969 F.2d at 1441–42. We also found that there is a "well-defined, dominant public policy favoring voluntary employer prevention and application of sanctions against sexual harassment in the workplace." *Id.* at 1442. We then held that "an award which fully reinstates an employee accused of sexual harassment without a determination that the harassment did not occur violates public policy." *Id.* We reached this conclusion without identifying any statute, regulation, or court decision that made the reinstatement of the deliveryman—as opposed to the alleged sexual harassment—illegal. Thus, our decision in *Stroehmann Bakeries* implicitly rejected the argument that an arbitration award may be vacated on public policy grounds only when the award requires conduct that is prohibited by positive law.

Even more recently, in *Exxon Shipping Co. I,* we expressly rejected this argument. We noted that the District of Columbia Circuit had accepted this argument but that the First, Sixth, Seventh, and Eighth Circuits had "taken a broader approach, ruling that arbitration awards reinstating employees may be vacated if the awards are 'inconsistent with some significant public policy.'" 993 F.2d at 363 (citation omitted). We concluded that "[t]he broader test adopted by the First, Sixth, Seventh, and Eighth Circuits appears to be the sounder approach." *Id.* Moreover, we upheld a district court order vacating an arbitration award that did not require conduct that violated any statute, regulation, or other manifestation of positive law.

In *Exxon Shipping Co. I*, which bears a striking factual resemblance to the case now before us, an able bodied seaman on an oil tanker was given a drug test. If he had been found to have used illegal drugs, revocation of his merchant mariner's document would have been mandatory unless he showed that he was "cured,"[5] and after revocation his continued employment on the ship would have been prohibited.[6] The results, however, were considered negative under the standards contained in the Coast Guard regulations (993 F.2d at 358 & n.1), and consequently his document could not be revoked, and no federal statute or regulation prohibited the company from continuing to employ him. Nevertheless, because the test results were considered positive under the company's more stringent standards (*id.*), the seaman was discharged. An arbitration panel found that the seaman's drug use had been " 'conclusively establishe[d]' " (*see id.* at 359 n.1), but the panel ordered his reinstatement. The district court, however, vacated the award, and we affirmed. Relying on Coast Guard regulations and other provisions of federal law, we identified "a 'well-defined and dominant' public policy against the operation of a vessel under the influence of drugs or alcohol" (*id.* at 362), and we concluded that

the arbitration award violated this policy. We emphasized "the potentially disastrous effects of a major oil spill on the environment" and expressed "concern about seamen operating vessels under the influence of drugs or alcohol." *Id.* at 367. We stated that "[t]he magnitude of possible harm to the public distinguishe[d] this case from those cases upholding arbitration awards against public policy challenges," and we added that "[t]he operation of an oil tanker by an employee under the influence of drugs or alcohol can result in far more severe and widespread damage than the workplace negligence of the paper plant employee in *Misco.*" *Id.* at 368.[7] Thus, like other courts of appeals in comparable cases, we vacated the arbitration award requiring the seaman's reinstatement even though it did not require conduct prohibited by positive law. *See Gulf Coast Indus. Workers Union v. Exxon Co., U.S.A.*, 991 F.2d 244, 257. (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 441, 126 L.Ed.2d 375 (1993) (affirming order vacating arbitration award that required reinstatement of refinery worker who tested positive for drugs); *Delta Airlines Inc. v. Air Line Pilots Ass'n Int'l,* 861 F.2d 665, 674–75 (11th Cir. 1988), *cert. denied,* 493 U.S. 871, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989) (vacating

5. 46 U.S.C. § 7704(c) (Supp.1993); *see also* 46 C.F.R. § 16.201(c) (1992).

6. 46 U.S.C. § 8701(d) (Supp.1993); *see also* 46 C.F.R. § 16.370(d) (1992).

7. Our decisions in *Stroehmann Bakeries* and *Exxon Shipping Co. I* do not conflict with our earlier decisions and statements concerning the power of a federal court to vacate an arbitration award on public policy grounds. In *Ludwig Honold Manufacturing Co. v. Fletcher*, 405 F.2d 1123, 1128 n.27 (3d Cir. 1969), we stated that an award may properly be vacated *either* because it "violates a specific command of some law" *or* "because of inconsistency with public policy."

In *Kane Gas Light & Heating v. International Brotherhood of Firemen, Local 112,* 687 F.2d 673, 681 (3d Cir. 1982) (in banc), *cert. denied,* 460 U.S. 1011, 103 S.Ct. 1251, 75 L.Ed.2d 480 (1983) (footnote omitted), we stated that an award should be vacated "only where [it] conflicts directly with federal or state law." We do not believe, however, that this statement, when read in context, was meant to embrace the view that an award may be vacated only when it orders conduct that positive law forbids. First, the statement was offered as an interpretation of the

earlier statement in *Honold. See id.* Second, the opinion subsequently approved the broader view that an award may be vacated if "upholding [it] would amount to 'judicial condonation' of illegal acts." *Id.* at 682. Applying this test, we refused to vacate the arbitration award, which required reinstatement of a discharged employee, because we concluded that reinstatement would not amount to such condonation. *Id.* In the present case, by contrast, the district court observed, and we agree, that the arbitration award requiring Fris's reinstatement "sen[t] an undesirable signal to other employees that alcohol abuse in a safety-sensitive job and industry would not be severely punished." Dist.Ct.Op. at 30; *cf. Newsday v. Long Island Typographical Union, No. 915,* 915 F.2d 840, 845 (2d Cir. 1990), *cert. denied,* 499 U.S. 922, 111 S.Ct. 1314, 113 L.Ed.2d 247 (1991) (reinstatement of employee found to have sexually harassed co-worker would "condone" this behavior). Third, our subsequent decisions have not interpreted *Kane Gas Light & Heating* as adopting the view that an award may be vacated only if it requires illegal conduct. *See Exxon Shipping Co. I,* 993 F.2d at 363 n.6; *Super Tire Engineering v. Teamsters Local Union No. 676,* 721 F.2d 121, 125 n.6 (3d Cir. 1983), *cert. denied,* 469 U.S. 817, 105 S.Ct. 83, 83 L.Ed.2d 31 (1984).

arbitration award that reinstated a pilot who flew while intoxicated); *Iowa Elec. Light & Power v. Local Union 204, Int'l Bhd. of Elec. Workers,* 834 F.2d 1424, 1430 (8th Cir. 1987) (refusing to reinstate nuclear power plant employee who committed serious safety violation); *Amalgamated Meat Cutters v. Great Western Food Co.,* 712 F.2d 122, 125 (5th Cir. 1983) (reversing arbitration award reinstating over-the-road truck driver who drank alcohol while on duty).

B. Applying our holding in *Exxon Shipping I,* we agree with the district court that the award in question in this case violates a public policy that is both well defined and dominant. *viz.,* that an owner or operator of an oil tanker should not be compelled to reinstate to a "safety-sensitive" position an individual who has been found to be intoxicated while on duty on that vessel.

Congress has expressly declared that it is "the policy of the United States that there should be no discharges of oil" into waters under federal jurisdiction. 33 U.S.C. § 1321(b)(1) (1988). Congress, moreover, has implemented this policy by enacting strong remedial and penalty provisions. Under the Clean Water Act, 33 U.S.C. § 1321(f) (1988), the owner or operator of an oil tanker that causes a spill is liable for the costs of removal. Similarly, under the Oil Pollution Act of 1990, 33 U.S.C. § 2702 (Supp.1993), an owner or operator may be liable for, among other things, removal costs, injury to natural resources, loss of the use of natural resources for subsistence, injury to real or personal property, loss of taxes by a government unit, loss of profits and earning capacity, and any increase in the cost of providing public services during removal. While there are limits on liability under both Acts, these limits do not apply if the spill was caused by gross negligence, willful misconduct, or, under the Oil Pollution Act, the violation of an applicable federal regulation. 33 U.S.C. §§ 1321(f)(1), 2704(c) (1988 & Supp.1993). The Clean Water Act also provides for substantial civil and administrative penalties. 33 U.S.C. §§ 1319(d) & (g) (1988 & Supp.1993). Moreover, the Clean Water Act and the Oil Pollution Act generally do not preempt state laws regarding liability for the discharge of oil, and many states have enacted such statutes. *See, e.g.,* Alaska Stat. § 46.03.822 (1993); Cal. Harb. & Nav. Code §§ 151, 293 (Deering 1993); Del.Code Ann. tit. 10, § 8134(c) (1992); Me.Rev.Stat.Ann. tit. 38 § 552(4)(C) (West 1992); Md.Envir.Code Ann. § 4–417(a) (1993); N.J.Stat.Ann. 58:10–23.11a–z (1992); N.Y.Nav.Law § 181 (McKinney 1993); Or.Rev.Stat. § 466.640 (1991); 35 Pa.Stat.Ann. § 6023.3(b) (Supp. 1993); Wash.Rev.Code § 90.56.370 (1991). In addition to these civil remedies and penalties, an owner or operator of a tanker that causes a spill may be criminally liable under an array of federal and state statutes. *See, e.g.,* 33 U.S.C. §§ 407, 411, 1232(b), 1319(c) (1988); 46 U.S.C. § 3718(b) (Supp.1993); Alaska Stat. § 46.03.790(d) (1993); Md.Envir.Code Ann. § 4–418 (1993).

Not only has Congress enacted measures designed to prevent and deter oil spills, but Congress has also focused specifically on the risk that such spills may be caused by oil tanker personnel who are under the influence of alcohol or drugs. The Senate Report on the Oil Pollution Act of 1990 stated:

> The captain of the Exxon Valdez had a blood alcohol level of .06 when tested nine hours after the vessel ran aground. This is in excess of the current Coast Guard regulations which prohibit the operation of a vessel with a blood alcohol content greater than .04.

Sen. Rep. No. 99, 101st Cong., 2d Sess. 10 (1990), *reprinted in* 1990 U.S.C.C.A.N. 722, 750, 758. Referring to a "serious and pervasive problem in the maritime industry," the report concluded:

> The Committee believes that it is beyond dispute that the public has an overriding interest in assuring that oil tanker personnel performing duties which directly affect the safety of a vessel's navigation or operations do so free of the influence of alcohol.

*Id.* at 10, 1990 U.S.C.C.A.N. at 758–59. The report added: "The Committee believes strongly that serving in safety sensitive positions on oil tankers while impaired by alcohol is wholly incompatible with the need to ensure safe operations." *Id.*

Consistent with these views, the Coast Guard has promulgated regulations permitting a marine employer to require crew members on commercial vessels to undergo a chemical test for alcohol or drugs when the

crew member is involved in an accident or is suspected of being intoxicated. 33 C.F.R. § 95.035 (1993). A crew member who is intoxicated while on duty is guilty of a crime and is liable for a civil penalty. 33 C.F.R. § 95.055 (1993). Marine employers are prohibited from allowing an intoxicated individual to "stand watch or perform other duties" (33 C.F.R. § 95.050(b) (1993)) and must exercise "due diligence" to see that the regulations concerning intoxication are not violated (33 C.F.R. § 95.050(a) (1993)).[8]

While we are aware of no statute or regulation that directly prohibits the owner or operator of an oil tanker from continuing to employ a crew member who is found to be intoxicated on duty,[9] there can be no doubt that the statutes and regulations we have noted convey the unequivocal message that such an owner or operator should take every practicable step to ensure that an intoxicated crew member does not cause or contribute to an oil spill. In addition to the possibility of liability for removal costs, civil damages, and penalties, an owner or operator might face additional sanctions if an accident is caused by the continued employment of a crew member with a history of intoxication while on duty. For example, if the employer's continued employment of the crew member were found to constitute gross negligence, it could be argued that the otherwise applicable limitations on liability would not apply.

Moreover, the continued employment of the crew member could be advanced as a ground for criminal liability. It is noteworthy that two of the criminal offenses for which Exxon and Exxon Shipping were indicted following the grounding of the Exxon Valdez were based on the employment of crew members who were allegedly "incompetent" or "physically or mentally incapable" of performing their duties.[10]

If the owner or operator of an oil tanker employed an able bodied seaman whose merchant mariner's document had been suspended or revoked based on intoxication while on duty or some other form of alcohol-related misconduct, the owner or operator would violate 46 U.S.C. § 8701(b) (Supp.1993)[11] and would be liable under 46 U.S.C. § 8701(d) (Supp.1993) for a civil penalty of $500.[12] Under the narrowest understanding of a federal court's authority to vacate a labor arbitration award on public policy grounds—i.e., that a federal court may do so only if the award requires conduct that is prohibited by positive law—a court could properly vacate an arbitration award requiring the reinstatement of such a seaman. It seems quite unrealistic, however, to say that a statute such as 46 U.S.C. § 8701, which imposes a modest civil penalty, constitutes a clearer or stronger expression of public policy than the statutes and regulations relating to civil and criminal liability for oil spills,[13] since these

8. Like these Coast Guard regulations, other federal statutes and regulations prohibit on-duty intoxication by employees holding a variety of other safety-sensitive positions. *See Exxon Shipping I*, 993 F.2d at 361–62 & n.4.

9. A person lacking a valid merchant mariner's document may not be employed as an able bodied seaman (46 U.S.C. § 8701(b) (Supp.1993)), and such a document *may* be suspended or revoked for, among other things, violating a "law or regulation intended to promote marine safety or to protect navigable waters," an act of misconduct or negligence while on duty, or a conviction within the prior three years for operating a motor vehicle under the influence of alcohol and certain other similar offenses. 46 U.S.C. § 7703 (Supp.1993).

10. The charges were: wilfully and knowingly failing to ensure that the Exxon Valdez was constantly manned by competent persons, in violation of 33 U.S.C. § 1232(b)(1) (1988) and 33 C.F.R. § 164.11(b) (1993); and wilfully and knowingly employing and causing persons to be

engaged on the crew knowing them to be physically and mentally incapable of performing the duties assigned to them. Indictment in *United States v. Exxon Corp. & Exxon Shipping Co.*, Criminal No. A90–015 CR. (D. Ala.).

11. Under 46 U.S.C. § 8701(b), it is unlawful to engage or employ an individual to serve on board a covered vessel if the individual lacks a merchant mariner's document.

12. Under 46 U.S.C. § 8701(d), "[a] person (including an individual) violating this section is liable to the United States Government for a civil penalty of $500."

13. It may of course be argued that the prevention of oil spills does not require vacating arbitration awards such as the one at issue here because the owners and operators of oil tankers, aware of the liability they may incur if an intoxicated crew member causes a spill, will not enter into collective bargaining agreements requiring the arbitration of grievances related to the discharge of such a crew member unless it is effi-

statutes and regulations may result in millions of dollars of liability.[14]

Accordingly, based on our prior decision in *Exxon Shipping Co. I* and on the statutes, regulations, and expressions of congressional policy previously noted, we conclude that there is a well defined and dominant policy that owners and operators of oil tankers should be permitted to discharge crew members who are found to be intoxicated while on duty. An intoxicated crew member on such a vessel can cause loss of life and catastrophic environmental and economic injury. Some of this injury may not be reparable by money damages. Moreover, because of the limitations on liability under the Clean Water Act and the Oil Pollution Act,[15] it is entirely possible that much of the cost resulting from a major oil spill may fall on taxpayers and those who are injured by the accident. While the federal labor laws undoubtedly embody a strong policy favoring the settlement of labor disputes by arbitration, that policy must yield in the present context to the public policy favoring measures designed to avert potentially catastrophic oil spills.[16] In *Exxon Shipping I*, we held that this policy precluded the reinstatement of a seaman who tested positive for marijuana. Consistency with this precedent dictates a similar result here.[17]

### III.

For the reasons explained, therefore, we affirm the order of the district court.

cient to do so. Both the Clean Water Act and the Oil Pollution Act, however, generally limit an owner's or operator's liability for the damage caused by the spill. Under the Clean Water Act, liability is capped at $250,000. 33 U.S.C. § 1321(f) (1988). Under the Oil Pollution Act, the limit is $10 million. 33 U.S.C. § 2704(a)(1)(B)(i) (Supp.1993). Since the actual damage caused by a major oil spill can exceed these amounts, an owner's or operator's potential liability under federal law may not lead to collective bargaining agreements that deal in the most efficient way with the problem of seamen who are found to be intoxicated on duty.

14. In a somewhat similar vein, the *Restatement (Second) of Contracts* states that in determining whether the enforcement of a contract should be denied on public policy grounds, the existence of a provision of positive law prohibiting the conduct required under the contract is not necessarily sufficient. *See* Section 178, cmt. b and c (1979).

SEITZ, Circuit Judge, dissenting.

In the context of the application of the same public policy issue here presented, this court said in *Kane Gas Light & Heating v. International Brotherhood of Firemen, Local 112*, 687 F.2d 673, 682 (3d Cir.1982), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1251, 75 L.Ed.2d 480 (1983):

> Consideration of [*General Teamsters, Local Union 249 v.*] *Consolidated Freightways*, [464 F.Supp. 346] [ (1979) ] [*International Assoc. of Machinists v.*] *Campbell Soup* [*Co.*] [406 F.2d 1223] [ (1969) ] and [*International Union of Electrical, Radio & Machine Workers v.*] *Otis Elevator* [*Co.*, 314 F.2d 25] [ (2d Cir.1963) ] convinces us that only if upholding an award would amount to "judicial condonation" of illegal acts, should the award be vacated on grounds of inconsistency with public policy.

While agreeing that illegal acts are not involved here, the majority say that the quoted ruling is distinguishable, permitting it to promulgate a different controlling legal rule. Given the quoted ruling in *Kane Gas Light*, I submit that it is not distinguishable. If the explicit rule in that case is to be rejected, it is for an *en banc* court to do so. Otherwise, our Internal Operating Procedure, making reported opinions binding on subsequent panels, IOP 9.1, will be deprived of its stabilizing value.

15. See page 1193, *supra*.

16. *Cf.* William B. Gould IV, *Judicial Review of Labor Arbitration Awards—Thirty Years of the Steelworkers Trilogy: The Aftermath of AT & T and Misko*, 64 Notre Dame L.Rev. 464, 487–88 (1989) ("[I]f a certifying agency was to find that a drunken or drug produced stupor caused the Valdez oil spill, reinstatement of the guilty employee, whether by virtue of an arbitrator's award or a certifying agency's order, must be scrutinized carefully by a reviewing court. Common sense, let alone a proper application of the law of labor arbitration, requires no less.").

17. Because we hold that the district court correctly vacated the arbitration award on public policy grounds, we do not reach Exxon Shipping's argument that the award was improper for the additional reason that it did not draw its essence from the collective bargaining agreement.

SUR PETITION FOR REHEARING

March 9, 1994.

Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS and SEITZ *, Circuit Judges.**

The petition for rehearing filed by Appellant in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.