UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT



No. 96-2241

EXXON CORPORATION,

Plaintiff, Appellant,

v.

ESSO WORKERS' UNION, INC.,

Defendant, Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]



Before

Selya, Circuit Judge,

Coffin and Cyr, Senior Circuit Judges.



Douglas  B.  Neagli, with whom Michael J. Liston, Glass, Seigle
& Liston, Patrick J. Conlon, and Joseph T. Walsh, III were on
brief, for appellant.
Warren M. Davison, Mark A. de Bernardo, Nancy N. Delogu, and
Littler, Mendelson, Fastiff, Tichy & Mathiason, P.C. on brief for
Institute for a Drug-Free Workplace, amicus curiae.
Nathan S. Paven, with whom Paven & Norton were on brief, for
appellee.



July 8, 1997


SELYA, Circuit Judge. This appeal tests the margins of

an  arbitrator's ability to order the reinstatement, into a safety-

sensitive  job, of an employee who has failed a reliable drug test.

After painstaking reflection, we conclude that a well defined and

dominant  public policy encourages employers to develop, establish,

and  enforce  programs to prevent their employees from attempting to

perform safety-sensitive work while under the influence of

narcotics  or  other  intoxicants. Moreover, once an employer has set

such a program in place, it countermands public policy if courts

too readily rescue employees who fail to satisfy programmatic

standards from the predictable consequences of such violations.

Hewing to this line, we refuse to enforce the arbitral award of

which plaintiff-appellant Exxon Corporation (Exxon) complains.

I. BACKGROUND

The facts are essentially undisputed. Exxon operates a

fuel terminal in Everett, Massachusetts and employs several truck

drivers to supply petroleum to service stations and airports

throughout New England. Exxon's nemesis, the Esso Workers' Union

(the Union), appellee here, represents most of these drivers.

Exxon  and  the Union entered into a collective bargaining agreement

(the  CBA)  in  February  1990. The CBA establishes inter alia a five-

step  employee grievance procedure culminating in final and binding

arbitration.

Part  11  of  the  CBA  covers employee discipline. Its first

section  provides  that  Exxon "shall post a list of offenses which it

deems serious," and its second section provides that Exxon "may

2

discharge or otherwise discipline" any employee who commits a

posted offense. The second section also stipulates that any

employee  who  believes his suspension or discharge is without "just

cause" may pursue a grievance.

An  appendix  to  the  CBA  catalogs the posted offenses. The

list includes the following:

6. Alcohol Beverage/Habit-Forming or Illegal
Drug or Any Dangerous Substance

a. Being under the influence of an
alcoholic beverage or drug on
Company time or property. Testing
positive on a drug test or refusal
to submit to a drug test.

b. Bringing onto Company property,
or possessing, or using on Company
time or Company property, an
alcoholic beverage, illicit or
unprescribed controlled substance,
or  any  dangerous substance which the
Company believes may impair the
employee's ability to properly
perform duties in a safe and
responsible manner.

Exxon  has  implemented  a  comprehensive drug-free workplace

program (the DFW program), embodied in a formal policy statement

and the aforementioned list of posted offenses. The policy

statement declares in part:

Exxon Corporation is committed to a safe,
healthy, and productive workplace for all
employees. The Corporation recognizes that
alcohol, drug, or other substance abuse by
employees  will impair their ability to perform
properly  and  will have serious adverse effects
on  the  safety, efficiency, and productivity of
other  employees and the Corporation as a whole
. . . . Being unfit for work because of use
of  drugs  or  alcohol is strictly prohibited and
is grounds for termination of employment.

3

Exxon's program is carefully tailored to meet the goals of the

Drug-Free  Workplace  Act  of 1988 (the DFW Act), 41 U.S.C. SS 701-707

(1994). Exxon has made the program's terms available to all

employees; the program encourages employees voluntarily to report

drug and alcohol problems; and the company not only provides

rehabilitative services to employees who come forward, but also

promises that "[n]o employee . . . will be terminated due to the

request for help in overcoming that dependency or because of

involvement in a rehabilitation effort."

Exxon's program reflects the company's recognition that

drug use during the performance of safety-sensitive tasks poses a

significant  threat to co-workers and to the public. Therefore, it

subjects employees in these positions to random drug testing. In

that regard, the program puts Exxon's work force on notice of the

company's intention to conduct "[u]nannounced periodic or random

[drug]  testing" of employees who are working in certain designated

safety-sensitive jobs.

Albert  A.  Smith, a veteran Exxon employee, works in such

a  designated  position.   He is responsible for loading, driving, and

unloading  a  five-axle  tractor-trailer combination which, when fully

loaded,  carries 12,000 gallons of highly flammable motor fuel. He

typically drives this rig through many of New England's more

densely populated areas. Exxon requires employees who occupy

designated  safety-sensiti ve positions and Smith's is plainly such

4

a position h

igned  such  a  statement  in 1989, thereby attesting that he had read

and understood the parameters of Exxon's DFW program, that he was 1 to sign so-called compliance statements. Smit s

not abusing alcohol or drugs, and that he was amenable to random

drug testing.

On  August  21,  1990,  Smith reported for duty. Without any

forewarning, Exxon directed him to take a drug test. Smith

submitted to the test and apparently drove his regular route that

day. The test results were obtained the following week; they

revealed that Smith had cocaine in his bloodstream when tested.

Although the test results could not indicate when Smith had used

the cocaine or whether he had performed his job while still under

its pernicious influence, Exxon decided that Smith posed a threat

to public safety and fired him.

The Union grieved Smith's ouster. The grievance

culminated in arbitration. The parties put two questions to the

arbitrator:   (1)  Did  Exxon have just cause to discharge Smith? (2)

If  not,  what  is the appropriate remedy? In September of 1992, the

arbitrator found the results of the drug test to be reliable but

nonetheless decided that Exxon wrongfully terminated Smith's

employment. The arbitrator acknowledged that Part 11 of the CBA

gave Exxon the right to discharge Smith for committing a posted

1In an earlier, unrelated case which involved a hauler who,
like Smith, failed a random drug test, we described a somewhat
similar  job  as  entailing  "work of a kind where, one suspects, there
might be old practitioners, and there might be bold practitioners
 but  there  would likely be few (if any) old, bold practitioners."
Jackson v. Liquid Carbonic Corp., 863 F.2d 111, 112 (1st Cir.
1988).

5

offense, but he reasoned that this right was subject to Part 11's

"just  cause"  provision. Concluding that dismissal was too extreme

a  punishment,  the  arbitrator settled upon a two-month suspension as

an appropriate disciplinary measure, to be followed by Smith's

reinstatement if he passed a contemporaneous drug test.

Exxon balked at the arbitrator's award and sued in

federal district court to set it aside. The parties cross-moved

for summary judgment. The lower court granted the Union's motion

and affirmed the arbitral award. Unyielding in its commitment to

prevent Smith from getting behind the wheel of a petroleum truck,

Exxon appeals. Our review of the district court's legal

conclusions is plenary. See Prudential-Bache Securities, Inc. v.

Tanner, 72 F.3d 234, 237 (1st Cir. 1995).

II. PRINCIPLES AFFECTING JUDICIAL REVIEW

Collective bargaining agreements are designed to

memorialize the terms and conditions of employers' relationships

with  their  unionized  employees. These agreements typically contain

grievance procedures that designate arbitration as the final

dispute-resolution mechanism. "In such cases . . . courts play

only a limited role when asked to review the decision of an

arbitrator." United Paperworkers Int'l Union v. Misco, Inc., 484

U.S. 29, 36 (1987). In large part, that role is ordained by the

fact that "[i]n labor arbitration, matters of contract

interpretation are typically for the arbitrator, not for a

reviewing court." El Dorado Technical Servs., Inc. v. Union

General De Trabajadores, 961 F.2d 317, 319 (1st Cir. 1992). As

6

long as the arbitrator is arguably interpreting the CBA, a court

cannot  second-guess his decision. See id. (citing Misco, 484 U.S.

at 38); Dorado Beach Hotel Corp. v. Union De Trabajadores De La

Industria  Gastronomica,  Local 610, 959 F.2d 2, 3-4 (1st Cir. 1992).

In such purlieus, a court's task ordinarily is limited to

determining  whether  the  arbitrator's construction of the collective

bargaining agreement is to any extent plausible. See Misco, 484

U.S. at 36-38.

Policy  spins  this  web  of  rules. Judicial deference to an

arbitrator's  contract  interpretation furthers "[t]he federal policy

of settling labor disputes by arbitration [which] would be

undermined  if courts had the final say on the merits of [arbitral]

awards."   Uni ted Steelworkers v. Enterprise Wheel & Car Corp., 363

U.S.  593,  596 (1960). Through the medium of the CBA, the employer

and the union bargain for the arbitrator's interpretation, and a

federal court must respect that bargain. See W.R. Grace & Co. v.

Local Union 759, Int'l Union of United Rubber Workers, 461 U.S.

757, 765 (1983). It follows, therefore, that a court should not

tamper with an arbitral award "unless it can be shown that the

arbitrator acted in a way for which neither party could have

bargained." Local 1445, United Food & Commercial Workers Int'l

Union v. Stop & Shop Cos., 776 F.2d 19, 21 (1st Cir. 1985).

Public policy, however, has its own imperatives and

they occasionally conflict with the imperatives of contract

interpretatio n. It is a fundamental rule that courts must refrain

from enforcing contracts that violate public policy. Collective

7

bargaining agreements are simply a species of contracts and, as

such,  are  not  immune  from the operation of this rule. "As with any

contract . . ., a court may not enforce a collective-bargaining

agreement  that  is  contrary to public policy." W.R. Grace, 461 U.S.

at 766; accord Misco, 484 U.S. at 42-43. Because this refusal to

enforce  contracts  which  offend public policy is inured in judicial

tradition,  the  question  of what public policy demands is within the

judicial, not the arbitral, domain. See Misco, 484 U.S. at 43;

W.R. Grace, 461 U.S. at 766.

III. ANALYSIS

In the district court, Exxon argued for reversal of the

arbitral  award  on  two  grounds: first, that the arbitrator exceeded

his authority; and second, that the award violates public policy.

The district court rejected both arguments. See Exxon Corp. v.

Esso Worker's Union, Inc., 942 F. Supp. 703 (D. Mass. 1996).

Because courts ought not trespass unnecessarily into the

uncertainties of the public policy terrain, we begin by discussing

Exxon's more case-specific argument.

A. The Arbitrator's Authority.

The key to this issue lies in Part 11 of the CBA. One

section  of  Part 11 provides that Exxon "may discharge or otherwise

discipline" employees who commit posted offenses "may," in this

context, "means has a right to," according to the definition

contained  in  the CBA and another section provides that employees

may challenge discharges which Exxon has imposed without "just

cause."   Exxon asseverates that the arbitrator should have equated

8

the "right to discharge" language with the "just cause" language;

because  Exxon reserves the right to discharge employees who commit

posted offenses, this thesis runs, it perforce has just cause to

discharge such employees.

But  the  arbitrator  teased another meaning out of Part 11.

He  concluded  that  the  language which permits Exxon "to discharge or

otherwise discipline" an employee who commits a posted offense

furnishes  Exxon  with  a  range of disciplinary options, and that this

range  is  in  turn subject to an independent application of the just

cause  barometer. On this reading of Part 11, the arbitrator ruled

that  Exxon  did not have just cause to cashier Smith merely because

he tested positive for drugs.2

Although Exxon's interpretation of the CBA may be

somewhat  less strained, judges have no roving writ to construe the

contract language in the way that they think best. Rather, a

2According to the arbitrator:

just cause standard requires that the
prove by the preponderance of th The Company e
evidence that the employee committed the
offense and that the level of discipline was
warranted .   In this case the Company's actions
were automatic: if an employee in a
designated position tests positive, s/he is
terminated.   The Company's presumption is that
the employee is a danger to public safety and
the  only  remedy is to excise that danger. The
Company's self-imposed narrowness in its
choice of remedy fails to meet the just cause
standard. There was no evidence that Company
drivers had any record of dangerous driving
due to ingesting illicit drugs. In the case
of Smith, there was no record of any
discipline or any signs or indications of a
drug-related problem during his nearly twenty
years with the Company. [Emphasis supplied.]

9

court's proper province is to determine whether the arbitrator's

reading is plausible, albeit not the reading the court might

choose.   See  El Dorado, 961 F.2d at 320 ("When the language of the

underlying contract, taken in context and with due regard for the

surrounding circumstances, is fairly susceptible to differing

meanings, a reviewing court must not meddle with the arbitrator's

rendition."). In this instance, the arbitrator's interpretation

survives that indulgent scrutiny.

The proof of the pudding is found in Crafts Precision

Indus., Inc. v. Lodge No. 1836, Etc., 889 F.2d 1184 (1st Cir.

1989). There, the employer had dismissed an employee for

insubordination. The CBA listed insubordination as "one

`example[]' of conduct [that] may result in suspension, or

immediate  discharge," and also included a clause reserving for the

employer  the  exclusive  right to discipline employees. Id. at 1184-

85.   In  a  refrain that echoes the argument which Exxon makes here,

the  employer  argued  that  these two clauses, in conjunction, gave it

an  absolute  right to discharge an employee for insubordination and

urged the arbitrator to equate this right to discharge with the

CBA's  "just  cause"  provision. The arbitrator interpreted the right

to discharge as distinct from just cause to discharge and instead

reinstated the employee. On appeal, we upheld the award because

the challenged language was open to several interpretations, and

the  arbitrator's  position reflected one such (plausible) iteration.

See id. at 1185. Because Crafts is a fair congener, precedent

compels  us  to conclude that the arbitrator's interpretation of the

10

disputed language here is within the pale and that the arbitrator

did not exceed his authority in this respect.

B. Public Policy.

Exxon's second claim of error can most usefully be

discussed in three segments.

1.   Framing  the Inquiry. Misco is the watershed case in

respect to judicial review of an arbitration award which is

challenged on public policy grounds. There, the company employed

Cooper as a night-shift machinist whose duties involved the

operation of a dangerous piece of equipment. One night, police

arrested  him  in the company parking lot, having discovered him "in

the backseat of [a] car with marijuana smoke in the air and a

lighted  marijuana  cigarette in the frontseat ashtray." 484 U.S. at

33. The company then fired him for breaking its rule against

possession of illicit drugs on business premises. The union

grieved Cooper's discharge, and an arbitrator ordered his

reinstatement. The company sued and the federal district court

annulled the award based on public policy. The Fifth Circuit

affirmed, holding that Cooper's reinstatement "would violate the

public policy `against the operation of dangerous machinery by

persons under the influence of drugs or alcohol.'" Id. at 35

(quoting 768 F.2d 739, 743 (5th Cir. 1985)).

The Supreme Court reversed, ruling that a court may set

aside  an  arbitrator's  award on public policy grounds only when "the

contract  as  interpreted  would violate `some explicit public policy'

that is `well defined and dominant.'" Id. at 43 (quoting W.R.

11

Grace, 461 U.S. at 766). Neither common sense nor "general

consideration s of supposed public interests" are suitable vehicles

for identifying public policy; rather, courts must glean public

policy from laws and legal precedents. Id. (quoting W.R. Grace,

461 U.S. at 766). Because the lower courts had predicated their

perceptions  of  public  policy on intuition rather than positive law,

the judgment could not stand.

Misco  teaches that, though courts may set aside arbitral

awards which contravene public policy, they may do so only in a

narrow class of cases, marked by a special set of circumstances.

See  id.  at  43. To determine whether a particular case fits within

the confines of this class, courts must employ a two-tiered

analytic approach. First, since a generalized sense of public

policy provides an insufficient basis upon which to annul an

arbitral award, an inquiring court must review existing statutes,

regulations, and judicial decisions to ascertain whether they

establish a well defined and dominant public policy. If positive

law  does  not  give rise to such a policy, the inquiry is at an end.

See  id.  at  43-44. If, however, the court finds that such a policy

exists, it must then proceed to the second step of the pavane and

determine  whether  the  arbitral award clearly violates the discerned

public policy.3 See id. at 44.

3The Misco Court provided an apt illustration of how the
second-stage inquiry operates. It noted that, even assuming the
existence of the public policy perceived by the court of appeals,
reinstating Cooper did not necessarily frustrate that policy
because there was no showing that Cooper had used marijuana while
on  the  job.   The  Court  thought that "the assumed connection between
the marijuana gleanings found in Cooper's car and Cooper's actual

12

2.   Identifyi ng the Public Policy. There is a plenitude

of positive law to support the existence of a well defined and

dominant  public policy against the performance of safety-sensitive

jobs  while  under the influence of drugs or other intoxicants. See

Gulf  Coast  Indus. Workers Union v. Exxon Co., 991 F.2d 244, 252-53

(5th Cir. 1993) (collecting cases). Gulf Coast itself is a

representativ e case. There, the court set aside an arbitral award

which proposed to reinstate in a safety-sensitive position an

employee who had tested positive for drug use after admitting to

his  employer  that he had a drug problem but representing (falsely,

as matters turned out) that he was obtaining treatment and

abstaining from substance abuse. The court amply illustrated the

proposition that numerous statutes, regulations, and judicial

opinions "pronounce the emphatic national desire to eradicate

illicit  drugs  from  the  workplace," particularly in safety-sensitive

occupations.  Id. at 250; see also Exxon Corp. v. Baton Rouge Oil,

77 F.3d 850, 855-56 (5th Cir. 1996) (again finding a well defined

and dominant public policy against the performance of safety-

sensitive jobs while under the influence of drugs).

The Third Circuit has addressed the same issue in a

trilogy of cases (all featuring an employer related to the

appellant here). In Exxon Shipping Co. v. Exxon Seamen's Union,

993 F.2d 357 (3d Cir. 1993) (Exxon I), the court invoked public

policy  in  refusing to enforce an arbitral award which directed the

use of drugs in the workplace is tenuous at best and provides an
insufficient basis for holding that his reinstatement would
actually violate the [perceived] public policy." 484 U.S. at 44.

13

employer to reinstate a helmsman who had tested positive for drug

use after his ship ran aground. Id. at 364. The court relied in

part on a series of Coast Guard regulations, declaring them to be

"part of a broader public policy against operation of common

carriers under the influence of drugs," and found that policy

adequately  evinced  by  an  array of drug-testing regulations. Id. at

361-62 (citing 14 C.F.R. part 121, Appendix I (1992) (Federal

Aviation Administration drug-testing program); 49 C.F.R. part 219

(1991) (Federal Railroad Administration drug-testing program); 49

C.F.R. part 391 subpart H (1991) (Federal Highway Administration

drug-testing program)).

In Exxon Shipping Co. v. Exxon Seamen's Union, 11 F.3d

1189 (3d Cir. 1993) (Exxon II), the court continued on the same

course. It set aside as contrary to public policy an arbitral

award  reinstating  an  employee who reported to work inebriated. The

court declared "that an owner or operator of an oil tanker should

not be compelled to reinstate to a `safety-sensitive' position an

individual who has been found to be intoxicated while on duty on

that vessel." Id. at 1194. Finally, in Exxon Shipping Co. v.

Exxon  Seamen's Union, 73 F.3d 1287 (3d Cir.), cert. denied, 116 S.

Ct. 2515 (1996) (Exxon III), the court reinstated an employee who

had  refused  to submit to a drug test, finding that the CBA did not

require the employee to take the test. Even then, the court

reaffirmed its earlier finding that there exists a "broad public

policy against permitting an individual to operate a vessel while

under the influence of drugs or alcohol." Id. at 1292.

14

This chorus has many voices. Several other courts

likewise  have identified a well defined and dominant public policy

against the performance of safety-sensitive jobs by persons under

the influence of intoxicants. Thus, in Union Pacific R.R. Co. v.

United Transp. Union, 3 F.3d 255, 262 (8th Cir. 1993), the court

used public policy as a lever to set aside an arbitral award

reinstating a railroad brakeman who had tested positive for drug

use after a switching accident. The court had "no difficulty in

concluding that there exists a well-defined and dominant public

policy against a railroad's employment of individuals whose

impaired judgment due to the use of drugs or alcohol could

seriously threaten public safety." Id. at 261. Similarly, in

Delta  Air  Lines,  Inc.  v.  Air Line Pilots Ass'n Int'l, 861 F.2d 665,

674 (11th Cir. 1988), the court defenestrated an arbitral award

presuming to reinstate a pilot who had flown an aircraft while

obviously  drunk.   The  court described this as a "rare example of an

award the enforcement of which would violate clearly established

public policy which condemns the operation of passenger airliners

by  pilots  who  are  under  the influence of alcohol." Id. at 671. By

like token, the district court in Georgia Power Co. v.

International Bhd. of Elec. Workers, Local 84, 707 F. Supp. 531,

538-39 (N.D. Ga. 1989), aff'd, 896 F.2d 507 (11th Cir. 1990),

recognized the public policy against performance of safety-

sensitive jobs by persons under the influence of drugs and set

aside an arbitral award aimed at reinstating an employee who had

tested positive for drug use.

15

We  agree  with  these  courts. In our judgment, society has

achieved a broad national consensus that persons should not be

allowed to endanger others while laboring under the influence of

drugs. This consensus is made manifest by positive law and

translates  into  a  well  defined and dominant public policy indeed,

a  national  crusade    counselling against the performance of safety-

sensitive tasks by individuals who are so impaired.

One subset of this policy is that persons who are under

the influence of narcotics or other intoxicants should not be

permitted  to  operate commercial vehicles on public highways. This

conclusion is fortified by our knowledge that the legislatures of

those states through which Smith must drive a petroleum tanker-

truck have uniformly criminalized the operation of motor vehicles

by persons who are under the influence of alcohol or controlled

substances. See Mass. Gen. Laws Ann. ch. 90 S 24(1)(a)(1) (West

1997)  (criminalizing the operation of "a motor vehicle while under

the influence of intoxicating liquor, or of marijuana, narcotic

drugs,  depressants or stimulant substances"); R.I. Gen. Laws S 31-

10.3-31(a) (1996) (making it "illegal for any person driving any

commercial motor vehicle . . . to operate or control any such

vehicle while under the influence of alcohol, drugs, toluene, or

any  other  [controlled]  substance"); id. S 31-27-2(a) (criminalizing

the  driving  of "any vehicle . . . while under the influence of any

intoxicating  liquor,  drugs, toluene, or any controlled substance");

Conn.  Gen.  Stat.  Ann.  S  14-227a(a) (West 1997) (similar); N.H. Rev.

Stat. Ann. S 265:82 (I)(a) (1995) (similar); Vt. Stat. Ann. tit.

16

23, S 1201(a) (1995) (similar); Me. Rev. Stat. Ann. tit. 29-A, S

2411(1) (West 1996) (similar).

We find further evidence of this policy in Congress'

enactment in 1991 of the Omnibus Transportation Employee Testing

Act (the Testing Act), now codified in 49 U.S.C. S 31306 (1994).

The Testing Act instructs the Secretary of Transportation to

promulgate regulations "that establish a program requiring motor

carriers to conduct preemployment, reasonable suspicion, random,

and  post-accident  testing of operators of commercial motor vehicles

for the use of alcohol or controlled substances." Id. S

31306(b)(1)(A ). In response, several Department of Transportation

agencies have promulgated regulations designed to promote the

public policy against performance of safety-sensitive tasks by

persons who use drugs. For example, the Federal Aviation

Administration has devised a program which requires preemployment

drug testing as well as periodic drug testing of employees in

safety-sensitive positions. See 14 C.F.R. Part 121, Appendix I

(1996). The Coast Guard has promulgated regulations in order "to

minimize  the  use  of  intoxicants by merchant marine personnel and to

promote a drug free and safe work environment." 46 C.F.R. S

16.101(a)  (1996). The Federal Railroad Administration has adopted

regulations crafted to "prevent accidents and casualties in

railroad operations that result from impairment of employees by

alcohol or drugs." 49 C.F.R. S 219.1(a) (1996). The Federal

Transit  Administration's regulations now require each recipient of

a subsidy "to implement an anti-drug program to deter and detect

17

the use of prohibited drugs by covered employees." 49 C.F.R. S

653.3 (1996). Last, but surely not least, the Federal Highway

Administration's regulations have been tailored "to help prevent

accidents  and injuries resulting from the misuse of alcohol or use

of  controlled substances by drivers of commercial motor vehicles."

49 C.F.R. S 382.101 (1996).

Congress'  strongest statement against the performance of

safety-sensitive tasks while under the influence of drugs is

embodied  in  the DFW Act, which instructs federal agencies to award

contracts  or  grants only to those employers who promise to provide

a drug-free working environment by: (1) publishing a statement

informing employees that use of drugs is prohibited in the

workplace; (2) establishing a "drug-free awareness program;" (3)

providing employees with drug counseling and rehabilitation

services; (4) adopting and imposing penalties on employees who

violate the terms of the "drug-free awareness program;" and (5)

furnishing employees with copies of the employer's statement

against on-the-job drug use. 41 U.S.C. SS 701(a)(1), 702(a)(1).

At  this  point  in  American history, few elements of public

policy command the consensus that attaches to the policy against

the use of controlled substances by those whose work potentially

imperils others. Judicial decisions, agency regulations, and

legislative  enactments combine to form a solid phalanx of positive

law evidencing a well defined and dominant public policy against

the  performance  of  safety-sensitive tasks while under the influence

of  drugs.   Thus,  Exxon  has satisfactorily negotiated the first step

18

of the public policy pavane.

3. The Interface. Confirming the existence of a well

defined and dominant public policy is only half the battle. To

abandon an arbitral award as contrary to public policy, a court

must find that the award clearly violates the identified policy.

See Misco, 484 U.S. at 43; Prudential-Bache, 72 F.3d at 241. In

this instance, the Union contends that, even if there is a

cognizable public policy against the performance of safety-

sensitive  work  by  individuals who are under the influence of drugs,

reinstating Smith would not insult such a policy because there is

no  evidence  that  Smith  was in the grip of cocaine while driving his

petroleum truck. According to the Union, the positive result of

Smith's  random  drug  test  "merely" indicates the presence of cocaine

in  his  bloodstream; it does not necessarily signify that Smith was

under  the  influence of the narcotic either at the time of the test

or at the time he drove his rig.4

The  Union  casts this argument so narrowly that it misses

the mark. Relying upon job-relatedness as the sole determinative

factor in permitting employers to discharge employees who test

positive  for  drug use would force employers to wait for some other

consequential  indication  that drugs are affecting work performance.

4Altho ugh the arbitrator found that the drug test reliably
indicated  the  presence  of cocaine in Smith's system (a finding that
the Union does not contest on appeal), the test results could not
pinpoint when Smith was under the drug's influence. This
uncertainty arises from the fact that the manner in which cocaine
metabolizes within a person's body depends upon a myriad of
factors, many of which (e.g., the potency and purity of the drug
ingested, the drug-user's tolerance, food consumption, and
psychological condition) were not known to Exxon.

19

Typically, this other indication will be an accident. See, e.g.,

Union Pacific, 3 F.3d at 256-57; Exxon I, 993 F.2d at 358-59;

Amalgamated  Meat  Cutters, Local Union 540 v. Great W. Food Co., 712

F.2d 122, 123-24 (5th Cir. 1983). The notorious mishap involving

the Exxon Valdez, which produced vast environmental devastation,

highlights the core problem associated with this "wait-and-see"

approach. If we have learned anything from such catastrophes, it

is that employers must act affirmatively to avoid drug-related

accidents  rather than wait passively for such accidents to happen.

We conclude, therefore, that the well defined and

dominant  public  policy  which we have identified does not require an

employer  to  await the occurrence of an accident before discharging

an employee who tests positive for drug use. In this sense, the

public policy is not as closely cabined as the Union implies. It

is the Union's failure to recognize this aspect and, thus, to

appreciate the full breadth of the discerned public policy that

is fatal to its argument and crucial to our decision.

The pertinent public policy dictates not only that

employees  refrain  from  performing safety-sensitive jobs while under

the influence of drugs, but also that employers develop (and

enforce) programs designed to discourage such activity. This

added  dimension is most apparent in the DFW Act and in the Testing

Act. The impact of the latter statute is made manifest by the

proliferation of governmental regulations which mandate regular

drug testing for employees in safety-sensitive positions. See,

e.g., 14 C.F.R. Part 121, Appendix I (1996) (codifying Federal

20

Aviation Administration's drug-testing program); 46 C.F.R. SS

16.101-16.500 (1996) (codifying Coast Guard's chemical testing

program); 49 C.F.R. SS 219.1-219.715 (1996) (limning Federal

Railroad Administration's drug-testing procedures); 49 C.F.R. SS

653.1-653.83 (1996) (delineating Federal Transit Administration's

drug-testing procedures); 49 C.F.R. SS 382.101-382.605 (1996)

(describing, inter alia, Federal Highway Administration's drug-

testing procedures). This statutory and regulatory mosaic bears

witness that the same public policy which countervails the

performance  of safety-sensitive tasks while under the influence of

drugs also encourages (and, in some cases, requires) employers to

implement and enforce drug-free workplace programs which include

mandatory drug testing of those in safety-sensitive posts.

Consistent with this enhanced understanding of the

discerned public policy, we hold that forcing an employer to

reinstate an employee who tests positive for drug use pursuant to

a test that the employer administers as part of a drug-free

workplace program would undermine that policy. It makes no sense

to construe public policy as encouraging and in some cases

mandating employers to establish and enforce drug-testing

programs,  yet to preclude them from taking decisive action against

those employees who test positive.

The Union warns that this holding is wholly

unprecedented.   But  the  demands of public policy are dynamic rather

than static. Modern society's widespread recognition of, and

increasingly  aggressive response to, the growing drug problem is a

21

harbinger  that  public  policy may make progressively greater demands

on  industry.   Moreover,  the Union's claim that we are blazing a new

trail is not entirely accurate.

At least two recent cases track the expanding public

policy on which we rely. These cases note, albeit in dicta, that

employers  must not be compelled to reinstate personnel who violate

the  terms  of  a  comprehensive drug-free workplace program. In Baton

Rouge  Oil,  the Fifth Circuit reversed as contrary to public policy

an  arbitral  decision awarding back pay to an employee in a safety-

sensitive position who had tested positive for cocaine during a

random drug test. The court held that allowing the employee to

collect  back  pay  would  contravene public policy despite the absence

of  any  evidence that he actually had performed his job while drug-

impaired.   See  Baton  Rouge Oil, 77 F.3d at 856. In so holding, the

court noted the absurdity of reinstating such an employee:

It is undisputed that Chube [the employee]
occupied a safety-sensitive position. It is
also  undisputed that Chube tested positive for
cocaine  use  while occupying that position, and
thereby endangered the safety of other
employees. We think that the public policy
exception . . . must be read not only to
prohibit the prospective placement of an
employee into a position where he is a danger
to his company and to fellow employees (i.e.,
order  of  reinstatement into a safety-sensitive
position), but also to prohibit a
retrospective approval of the conduct . . . .

Id.

The Third Circuit echoed these sentiments in Exxon III

while  upholding an arbitral award which reinstated an employee who

refused  to  take  a  drug  test. The court premised this ruling on the

22

arbitrator's conclusion that, under the terms of the collective

bargaining agreement, the company lacked cause to insist upon a

drug test. See Exxon III, 73 F.3d at 1295-96. En route to this

determination, however, the court observed that "[a] clearly

defined and cautiously administered program of drug testing . . .

is the natural corollary to . . . a strong public policy that

precludes  allowing  intoxicated or drug-impaired seamen to remain in

safety-sensit ive positions aboard oil tankers." Id. at 1294. The

court went on to proclaim that the "right to test employees for

alcohol or drug use . . . is critical to achieving the objective"

of preventing drug-impaired individuals from performing safety-

sensitive  jobs. Id. The court's ensuing discussion left no doubt

that,  if  a  drug  test  was  validly requested, reinstating an employee

who boycotted it would undermine public policy. See id. at 1294-

95.

Baton Rouge Oil and Exxon III reinforce the proposition

that  a  comprehensive and finely-tuned DFW program which includes a

drug-testing  component  is a natural corollary to the ringing public

policy  against performance of safety-sensitive jobs by individuals

who  are  under the influence of narcotics or other intoxicants. It

follows  that,  if  an  employer elects to establish such a program and

properly preserves its right of implementation in the collective

bargaining agreement, thwarting the employer's efforts to enforce

the  program's standards would countervail the basic public policy.

The Union intimates that the public policy we have

identified,  if it persists at all, can be vindicated by some other

23

disciplinary  measure,  short of termination. This intimation misses

the

construed, 

would insult public policy for a court to enforce a contract that

a worker who has scorned the employer's drug-free workplace

program.5

This  case  is  emblematic of the proposition. In terms of

public policy, it would be grossly counterproductive to impede

Exxon's  efforts  at  fully  implementing its DFW program by forcing it

to reinstate an employee who blatantly violated the program's

terms.   Indeed, Smith's utter disregard for Exxon's DFW program is point. The arbitrator has said in effect that the CBA properly requires Exxon to reinstate Smith and it requires the ongoing employment in a safety-sensitive capacity of

one  feature  which distinguishes this case from Misco.6 Unlike the

employer in Misco, Exxon maintains a comprehensive DFW program

which  is  delicately  calibrated to further the public policy against

job performance while under the influence of drugs and other

5 , Moreover, the alternative remedy selected by the arbitrator
a two-month suspension, followed by a one-time drug test does
not hold out much promise for the safety of either the public or
Smith's fellow employees. Smith's failed drug trust evinces his
inability  or  unwillingness to conform to the strictures of the DFW
program. If he were returned to a safety-sensitive position, as
the arbitrator suggests, there would be no sound reason for
believing that the leopard had changed his spots.

    6 Another distinguishing feature is temporal in nature. Misco
arose out of an incident that occurred in January 1983. Judicial
review did not end until the Supreme Court spoke in 1987. Here,
however, Smith failed the drug test in the summer of 1990, and
judicial review is still ongoing. As our discussion of the
emerging  public  policy  reveals, see text supra, Misco predates both
the Testing Act and the DFW Act. This chronological reality
highlights  the broader fact: public policy in respect to drugs in
the workplace has matured greatly in the decade since Misco was
decided.

24

intoxicants. Smith transgressed the terms of this program three

times over: failing to report his drug use to Exxon, falsely

representing that he abjured illicit drugs, and testing positive

for drug use. Given this threefold violation, Exxon acted

reasonably  in selecting discharge as the most appropriate means of

eliminating the threat that Smith poses to the public. In the

bargain,  Exxon's action was also a necessary means of ensuring the

integrity of its DFW program. Forcing Exxon to reinstate, into a

safety-sensitive position, an employee who lacks any meaningful

commitment to its DFW program would hamstring its well-directed

attempts to implement public policy.

The Union tries to retrieve yet one more arrow from its

quiver.   Under  the  terms  of its DFW program, Exxon treats employees

who test positive for drug use more harshly than employees who

voluntarily come forward and reveal that they are experiencing

problems. During oral argument, the Union attempted to distort

Exxon's distinction between these two types of employees by

suggesting that, since Exxon does not discharge the latter (i.e.,

employees who voluntarily report drug abuse), it lacks sufficient

reason  to  discharge  the  former (i.e., employees who are "caught" by

random drug testing).

This argument is deeply flawed. Exxon encourages

employees  to  report  their drug use so that the company can transfer

such  workers  to  jobs  that do not implicate public safety while they

undergo rehabilitation. These employees do not pose a threat to

the public because, by reporting their drug abuse, they provide

25

Exxon with the opportunity to implement safety precautions. The

actions  of  these  employees are radically different from the actions

of employees who, like Smith, attempt to conceal their drug use.

These duplicitous employees pose a real and serious threat: by

failing  to  report  their  problem, they deny Exxon the opportunity to

take precautions to safeguard the public. On this basis, we

believe  it  is  reasonable  and fully consistent with the identified

public  policy for Exxon to offer a measure of job security as an

incentive for voluntary reporting, while cutting all ties with

employees  who do not accept the incentive and who subsequently are

caught.

We  need  go  no  further.   Because Smith thumbed his nose at

Exxon's DFW program, his reinstatement clearly would violate the

well defined and dominant public policy against performance of

safety-sensitive jobs while under the influence of drugs. Hence,

the federal courts must refuse to enforce the arbitral award.

Reversed.

26